[No. S010994. Dec. 11, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN GALEN DAVENPORT, Defendant and Appellant.

COUNSEL

Violet Elizabeth Grayson, under appointment by the Supreme Court, Zoe A. Topsfield, Doreen L. Boxer and Grayson, Topsfield & Boxer for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assisant Attorney General, Gary W. Schons, Assistant Attorney General, Janelle B. Davis and Nancy L. Palmieri, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ARABIAN, J.—This case reaches us again after a penalty phase retrial following this court's affirmance of defendant John Galen Davenport's 1980 first degree murder conviction (Pen. Code, §§ 187, subd. (a), 189),[1] and torture-murder special-circumstance finding (§ 190.2, subd. (a)(18)), and reversal of his death sentence based on instructional error. In reversing the penalty phase, we concluded that the penalty instructions erroneously failed to inform the jury of the standard of proof required before certain aggravating evidence could properly be considered, failed to inform the jury of its discretion to consider any element of defendant's background or character as a factor in mitigation of penalty (an instructional error compounded by the prosecutor's closing argument), and misled the jury by failing to make clear that the weighing of aggravating and mitigating circumstances is not a mechanical or numerical process, but rather entails the jury's responsibility for determining the appropriate punishment based on all the relevant evidence. (*People* v. *Davenport* (1985) 41 Cal.3d 247, 280 [221 Cal.Rptr. 794, 710 P.2d 861] (*Davenport I*).) For the guidance of the trial court on retrial of the penalty phase, we further found erroneous the prosecutor's reference to the Governor's power to commute a sentence of either death or life imprisonment without the possibility of parole, and his argument that the absence of evidence of a mitigating factor could be considered evidence of an aggravating factor. (*Id.* at pp. 277-278, 280, 287-289.)

At the ensuing 1989 retrial, the jury fixed the penalty for murder in the first degree with a special circumstance at death, and thereafter the court

---

[1] All statutory references contained herein are to the Penal Code unless otherwise indicated.

imposed a sentence of death. The case is before us on automatic appeal. (Cal. Const., art. VI, § 11; § 1239, subd. (b).) For the reasons that follow, we conclude that the judgment should be affirmed.

## I. FACTS

### A. *Davenport I*

Because this retrial involves only the penalty phase, we briefly review the evidence presented at the guilt phase, which was fully described in *Davenport I*, *supra*, 41 Cal.3d at pages 256-260.

Gayle Lingle, the victim, spent the evening of March 26, 1980, at the Sit 'N Bull Bar in Tustin. Between approximately midnight and 1 a.m., she and defendant left the bar. The victim's body was found the next morning lying in a large, uncultivated field south of the I-5 freeway near Tustin. There were motorcycle tracks in the area.

The victim, nude except for a sweater draped over her upper torso, suffered numerous and extensive stabbing and slashing wounds about her neck, chin and jaw as well as defensive wounds to her hands and forearms. Her carotid artery had been severed, and her breasts were bitten and bruised. A 52-inch nail-embedded wooden stake had been driven into her rectum, through her body, injuring various internal organs and tissues, and up to her right armpit.

The autopsy pathologist, Dr. Walter Fischer, testified that the cause of death was the loss of blood from the severed carotid artery, and that the victim's impalement by the wooden stake was a contributing factor. In Fischer's opinion, the victim was alive when she was impaled by the wooden stake. Dr. Renee Modglin, a pathologist called by the defense, opined that the stake had probably entered the victim's body after her death.

Defendant owned a "350 cc" Honda motorcycle, and his nickname was "Honda Dave." The prosecution produced three eyewitnesses who placed a motorcycle similar to one owned by defendant at the murder scene between 12:30 and 1:30 a.m. on March 27. Three expert witnesses testified to facts that connected defendant's motorcycle to the crime. Bonnie Driver, a criminalist employed by the Orange County Sheriff's Department, testified that she had examined vegetable matter taken from defendant's motorcycle and compared it with vegetation taken from the area where the victim's body was found. Driver found the gross morphology of the plants in both samples to be consistent with each other. A forensic microscopist, Skip Pallinick,

examined and compared the heavy mineral content of soil samples taken from defendant's bike with samples taken at the murder scene. He testified that the samples were generally consistent with each other. One of the samples from the motorcycle contained sufficient similarity to the murder scene samples that the witness concluded they were virtually indistinguishable. Both of these witnesses admitted they had not compared the samples taken from defendant's bike with samples taken from other parts of Orange County. Dr. Stephen Dana, a geologist retained by defendant, examined the same soil samples and found similarities and differences in all of them. Based on his knowledge of the geology of the area, Dana opined that the samples could have come from anywhere in Orange County.

Jack Leonard, the production manager for the International Sport and Rally Division of Dunlop Tire Company, testified that the tracks of the rear tire at the crime scene had the same highly unique and distinctive characteristics as the rear tire of the motorcycle. Both were Dunlop brand motorcycle tires, size 4.00-18 with a K-70 tread pattern, and both were characterized by a rare defect in a portion of the tread pattern known as the cross-slot. The degree of wear of defendant's tire was consistent with the tracks at the scene. The track of the front motorcycle tire at the scene showed a tread pattern which he recognized as a Bridgestone tire, similar to the front tire on defendant's motorcycle.

The prosecution also called as a witness John Farmer, who testified to incriminating admissions defendant made to him while both were in a holding cell at the Orange County Superior Court at various times between September 8, 1980, and December 19, 1980.

Defendant testified and relied on an alibi defense.

B. *Penalty Retrial*

1. *Prosecution Evidence*

a) *Circumstances of the Crime*

At the penalty retrial, the prosecution introduced much of the evidence from the guilt phase, including evidence regarding the circumstances of Lingle's death and connecting defendant to the crime.

By the time of the retrial, Dr. Fischer, the doctor who performed the Lingle autopsy, was deceased. Dr. Fukomoto, a pathologist who performed autopsies, and who had been Fischer's partner at the time of the Lingle autopsy, opined that Lingle was alive when she was impaled by the stake.

b) *Other Crimes*

The prosecution offered as evidence in aggravation testimony regarding two other instances of criminal activity by defendant which involved the use of force and violence. Susan Tewes (who at the time of the penalty retrial was Susan White) testified that one night in November 1974, as she slept on her couch, she was awakened by a man straddling, smiling, and stabbing her. Ms. Tewes thought she was having a dream and kept trying to wake herself. As she slowly realized it was not a dream, she began to fight. The man, later identified as defendant, continued smiling as he stabbed her in the throat, severing her jugular vein, and in her eye, breast, lung, stomach, arm, and hand.

Following the attack, Tewes managed to leave her apartment. Neighbors administered emergency aid and called an ambulance. Doctors were able to save her life and her eye. Her esophagus was severed so that she could not eat for several weeks. A tooth was severed at the gum line. Tewes had suffered 23 stabbing wounds. She never returned to her apartment.[2]

On December 19, 1980, while in custody for the charges in this case, defendant and others were in the same holding tank as James B. James testified that he gave his sandwich to someone in the tank. Defendant and other cellmates told James that because he had given his sandwich to one inmate, he had to do something for them. One person began to beat James, and told him he would have to orally copulate all of them. James was pulled into the bathroom, and forced to orally copulate between three and seven inmates, including defendant. Each one ejaculated. Defendant then pulled down James's jumpsuit and underwear and sodomized him. James told defendant he was hurting him, and asked defendant to stop, but he refused. When defendant realized he could not fully penetrate James he stopped. James did not report the incident.

2. *Defense Evidence*

Defendant presented evidence intended to create a lingering doubt as to the guilt phase jury's finding that Lingle was alive when she was impaled by the stake, an element of the special circumstance of torture murder. Stephan Schliebe, a criminalist for the California Laboratory of Forensic Science, examined the stake. His tests revealed no evidence of blood on the stake or the nails on the stake. He stated that the passage of time would not preclude

---

[2]The jury learned through a stipulation between the parties that as a result of this incident, on April 16, 1975, defendant was convicted of burglary and assault with a deadly weapon. He was released in August 1979, seven months before the Lingle murder.

a finding of blood. However, he conceded that he did not know the effect of silver nitrate, a chemical used to reveal fingerprints, on blood after a nine-year lapse.

Dr. Ronald Kornblum, a medical examiner for Los Angeles County and pathologist, testified that in his opinion Lingle died before she was impaled by the stake.

Defendant's mother, two sisters, two nieces, and nephew testified. The purpose of this testimony was to persuade the jury that defendant's life had value because defendant was a loving and attentive relative from whom the family received significant emotional support. In addition, defendant's nephew testified that defendant had expressed remorse for the Tewes assault.

Defendant also testified, identifying certain artwork he had created while incarcerated. These paintings and certain correspondence written by defendant were admitted into evidence.

### 3. *Rebuttal Evidence*

Margaret Ann Black, a supervisor in the identification bureau of the sheriff's coroner's office, testified that the stake had been treated with silver nitrate.

Dr. Fukomoto testified again regarding in part certain additional tissue slides that he had not reviewed prior to his original testimony. His conclusions were consistent with his original testimony.

## II. DISCUSSION

### A. *Constitutionality of Penalty-phase Only Retrials*

■ Defendant contends that penalty-phase only retrials are unconstitutional per se, depriving him due process, equal protection of the law, his Sixth Amendment right to a fair trial, Eighth Amendment right to a reliable and proportional sentence, and "analogous provisions of the California Constitution, and that we should therefore remand his case for a new unified trial." We have recently rejected a substantially similar claim.

In *People* v. *Hawkins* (1995) 10 Cal.4th 920, 966 [42 Cal.Rptr.2d 636, 897 P.2d 574] the first jury deadlocked at the penalty phase. The second penalty phase jury unanimously agreed on a sentence of death. (*Ibid.*) On appeal, Hawkins made "several claims of error revolving around the constitutionality of having a second penalty phase jury sentence him to death without

having heard all the guilt phase evidence." (*Ibid.*) First, he noted that a defendant has an Eighth Amendment right to introduce mitigating evidence at the penalty phase, and argued that "[b]y divorcing the penalty phase from the guilt phase and presenting defendant's guilt in the . . . murder as a given, defendant was deprived of the possible benefit of whatever lingering doubts the first jury may have possessed as to whether defendant was" the murderer. (*Ibid.*) "It was this lack of lingering doubt, [Hawkins] contend[ed], that allowed the second penalty phase jury to do what the first jury was unable to do: unanimously agree on a sentence of death." (*Ibid.*)

We rejected this claim, stating, "It is true that residual doubt about a defendant's guilt is something that juries may consider at the penalty phase under California law, and a trial court errs if it excludes evidence material to this issue." (*People* v. *Hawkins, supra,* 10 Cal.4th at pp. 966-967.) "Here, however, defendant was not prevented from putting on guilt phase evidence at the penalty phase so as to raise the possibility of lingering doubt, or from advocating this theory at closing argument. Defendant did in fact argue to the jury that the forensic evidence had failed to establish beyond a reasonable doubt that the . . . murder had been committed with premeditation and deliberation; he chose not to present evidence or to make an argument, however, that would raise the issue of reasonable doubt regarding his identity as [the] murderer. We have never held that the right to introduce evidence of residual doubt translates into the right to have the same jury at the guilt and penalty phases. Indeed, the *Terry* court, which first recognized the former right, assumed that a capital defendant's trial by different guilt and penalty phase juries was lawful, so long as defendant was able to introduce to the penalty phase jury guilt phase evidence intended to show lingering doubt." (*People* v. *Hawkins, supra,* 10 Cal.4th at p. 967.)

We also rejected Hawkins's further contention that "a capital defendant has [a] federal constitutional right to have the jury consider lingering doubt at the penalty phase of the trial. (*Franklin* v. *Lynaugh* (1988) 487 U.S. 164, 173-174, fn. 6 [101 L.Ed.2d 155, 165-166, 108 S.Ct. 2320].)" (*People* v. *Hawkins, supra,* 10 Cal.4th at p. 967; see *People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1240 [9 Cal.Rptr.2d 628, 831 P.2d 1210] ["United States Supreme Court has . . . essentially found constitutionally sound the practice of penalty-only retrials"].)

Finally, as relevant to this case, we rejected Hawkins's equal protection claim that "he was put in a worse position than a similarly situated, death-eligible defendant whose guilt and penalty were decided by the same jury, because he could not benefit from lingering doubt to the same degree as the latter defendant." (*People* v. *Hawkins, supra,* 10 Cal.4th at p. 967.) We

observed, "a bifurcated trial does not restrict a defendant's ability to introduce guilt phase evidence designed to foster residual doubt. Nor, of course, is it at all clear that a defendant whose penalty has been determined by a second jury is put at a disadvantage; he may also benefit from having a jury which has not focused at length on the details of his crimes. Defendant's equal protection claim is therefore without merit." (*Ibid.*)

Thus, contrary to defendant's assertion, penalty-phase only retrials are not unconstitutional per se. Indeed here, unlike *Hawkins*, the first penalty jury did unanimously agree on a judgment of death; however, that judgment was reversed on appeal. Moreover, also unlike *Hawkins*, a significant portion of the guilt phase evidence was presented to the jury. Defendant strenuously litigated this evidence and sought to raise a lingering doubt in the penalty jurors' minds as to the torture-murder special circumstance, i.e., whether Lingle was alive when she was impaled by the stake. In addition, in an abundance of caution, the court instructed jurors to consider any lingering doubt as to whether the murder involved torture, and placed no limitation on counsel's argument regarding this theory. Defendant did in fact argue that the forensic evidence had failed to establish that Lingle died after she was impaled by the stake.

### B. *Jury Selection Issues*

Defendant contends certain trial court rulings during jury selection were constitutionally defective. We conclude these rulings were within the trial court's discretion.

#### 1. *Denial of Defendant's Motion to Join*

██ Defendant contends the trial court abused its discretion and committed reversible error in denying defendant's motion to join in a motion made at the trial court level in *People* v. *Ramos* (S005499, app. pending) and *People* v. *Cinco* (S006096, app. abated Mar. 20, 1989), both capital cases, one of which is currently pending before this court, and in prejudging the motion.[3] In particular, he claims that the trial court's ruling deprived defendant of the opportunity to be heard, to fully develop his record in the trial court, and precluded effective appellate review, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments. These claims are meritless.

On May 23, 1986, defendant moved to quash the jury venire "on the ground that Hispanic persons are underrepresented in the composition of

---

[3] *People* v. *Cinco* was abated when the defendant died in 1989.

Orange County jury panels in relationship to their numbers in the community-at-large and, consequently, Defendant cannot receive a fair trial by a jury of his peers." "Rather than litigate this motion on his own," defendant requested that he be allowed to join in a similar motion pending in the *Ramos/Cinco* cases. Defendant's trial was scheduled to begin on September 15. Defense counsel asserted in a declaration filed in support of the motion that the *Ramos/Cinco* hearing was scheduled for August 1.

The motion to join was heard on June 20, 1986. The trial court began the hearing by informing counsel that the *Ramos/Cinco* motion "will not even be ready any earlier than September 22," or "after the date that your case was set to start." It noted that under section 1050, "criminal cases should go to trial without delay and unless there is good cause for continuance." The court stated that it had had a number of motions in other death cases to join in the *Ramos/Cinco* motion, but that so far it had resisted allowing such joinder for a number of reasons. First, the *Ramos/Cinco* motion was "large enough by itself . . . almost unwieldy because of the number of counsel involved." Second, "there is simply no legal possibility that any ruling which might result from [the *Ramos/Cinco* motion] would only be prospective in operation." Third, the court did not want to slow down the *Ramos/Cinco* cases in violation of section 1050 by adding additional defendants. Finally, the court stated that "there is no legal authority for one criminal defendant to join another criminal defendant's case." "[F]or all of those reasons," the court believed each defendant ought to proceed on his own, "and if he has a meritorious motion the court should, no question about it, give it full consideration."

Following argument by counsel, the court denied the motion without prejudice. In so ruling, the court stated, "If your case is . . . continued for some other reason . . . , for good cause, then you know, I would reconsider it, if you want to make a motion at a later time. But at the present time . . . . I don't want this joinder to be used as an excuse to continue the criminal trial unless it is not otherwise ready for other reasons." Defendant neither raised the issue on his own, nor did he renew his motion to join at a later date. Jury selection actually commenced nearly three years later in February 1989.

Defendant asserts that he was "denied his constitutional right to trial before a jury drawn from a fair cross-section of the community because Orange County's method of drawing jurors from the community systematically resulted in underrepresentation of [H]ispanics." As noted above, defendant pursued this objection solely in the form of a motion to join a similar motion pending in the *Ramos/Cinco* cases. It was denied without prejudice, and he never renewed it or filed his own motion to quash although he had ample opportunity to do so. Hence he has waived the issue for appeal.

We further conclude that the trial court's denial of defendant's motion to join in the motion in the unrelated *Ramos/Cinco* cases was a proper exercise of the trial court's discretion. The trial court reasonably found that because the *Ramos/Cinco* motion would not be heard until after defendant's trial was scheduled to commence, granting the motion to join would in effect be granting a continuance. Furthermore, because the court found that there was no reason for granting the motion to join, it implicitly found there was no good cause for continuing the trial as required by section 1050. Denial of what is essentially a motion for a continuance, when no good cause is demonstrated, is not an abuse of discretion. (§ 1050; cf. *People* v. *Zapien* (1993) 4 Cal.4th 929, 972 [17 Cal.Rptr.2d 122, 846 P.2d 704].) Moreover, defendant did not renew his motion to join, or file his own motion to quash the venire, despite the fact that jury selection did not actually commence until February 1989. Finally, defendant does not assert how the trial court abused its discretion, or how he was prejudiced by the denial of his motion for joinder.

Contrary to defendant's assertion, the trial court's reasoning does not "conflict[] with established principles of judicial efficiency." Nor do we agree with defendant that "[b]ecause judicial economy is clearly not served by requiring duplicative litigation of an identical issue, the judge's ruling strongly suggests that he knew he would rule adversely in the *Ramos* and *Cinco* cases, which were pending before him. Bias of the trial court, in the form of prejudging a key legal issue, violates the constitutional right to a fair trial." Defendant never challenged the trial judge on the ground that he was biased; hence he has waived any such claim. Nor was the trial court's refusal to allow defendant to join in a motion in an unrelated case even colorable evidence that the trial judge was guilty of bias or prejudging.

Defendant also argues that "given the substantial investment of time, money, investigation and expertise, required to mount a challenge to a county's method of drawing jurors from the community, many affected defendants will not proceed on their own," thus "interfering with effective representation of the capital case defendants." Defendant did not make this argument below; indeed, even on appeal he does not assert that these factors affected *his* decision to not make an individual motion challenging the Orange County grand venire. The assertion is therefore entirely speculative and untethered to any issue in this case.[4]

Defendant further asserts that the trial court erroneously considered whether defendant was Hispanic or Spanish-speaking in ruling on his motion

---

[4]Defendant requests that we take judicial notice of the trial record and appellate briefs in *People* v. *Ramos, supra,* S005499, appeal pending. We decline to do so in the absence of an individual motion challenging the jury venire.

to join. In fact, while the trial court made such an inquiry, it stated that defendant did not have to be "a member of the same racial group that he is claiming is in dispute with the jury commissioner," and that it asked the "question because I think it should be in the record in case there is some appellate review and they need to determine how important it really is on a personal basis for the defendant to make the motion."

Defendant appears to argue that the trial court erred by observing that six years had elapsed since the crime was committed. No error is apparent. After delineating its reasons recited above for denying the motion for joinder without prejudice, the trial court noted that "the crime allegedly occurred in 1980 and it is already six years old." Defense counsel stated, "As the court knows it was tried and has been up and back. It's just been back since March." The trial court responded, "I am not suggesting its [sic] anybody's fault. But basically that has been a very long time. And we do like to see a speedy resolution of these criminal cases and six years does not qualify as a speedy resolution." Defense counsel stated, "I would agree." Contrary to defendant's assertion, this colloquy does not indicate the trial court was blaming defendant for delays "associated with the appointment of counsel or the prosecution and decision of meritorious appeals"; indeed, the trial court expressly stated just the opposite.

### 2. *Alleged Wheeler Error*

 Defendant contends the prosecutor impermissibly exercised three of his first six peremptory challenges to exclude members of a cognizable group, those with Hispanic surnames, from the jury in violation of his right to trial by a jury drawn from a representative cross-section of the community, guaranteed by article I, section 16, of the California Constitution, "the Fair Trial guarantee of the Sixth Amendment," and the prospective jurors' right of equal protection. The trial court denied the motion, finding that defendant had failed to establish a prima facie case of discrimination. We conclude defendant's claims are without merit.

### a) *Factual Background*

The prosecutor exercised three of his first six peremptory challenges against prospective jurors who had Hispanic surnames, Salcido, Venegas, and Flores. Following the peremptory challenge of Flores, defense counsel requested a sidebar, stating he was "asking the court to require the district attorney to justify why it is that out of the first six per-empts [sic] he's exercised, three of them have been people of Hispanic origin with Hispanic surnames, and we would suggest that under [*People* v. *Wheeler* (1978) 22

Cal.3d 258 (148 Cal.Rptr. 890, 583 P.2d 748)] there aren't any grounds to do that." The trial judge asked the prosecutor, "Do you wish to respond?" The prosecutor then delineated his reasons for exercising each challenge, all of which he stated arose from the prospective jurors' responses and the prosecutor's observations during *Hovey* voir dire. (*Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 80-81 [168 Cal.Rptr. 128, 616 P.2d 1301].) The judge asked the defense attorney making the motion if he had been present during the *Hovey* voir dire of the three prospective jurors. He replied, "No, all I've done is read the transcript." The court stated, "Well, I think under the circumstances, the court would like to look at those transcripts, too, before we go any further with this." The court noted it was almost 4 p.m. Defense counsel noted that the remedy under *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr 890, 583 P.2d 748] "is that the court brings in a new panel . . . I don't mind the court taking it under submission, but it's of particular concern for me because there are still Hispanics in the courtroom." The court responded, "I think you're jumping way ahead. *I have not even made a determination at this point that there's a prima facie showing sufficient to require the district attorney to respond.* I asked him if he wanted to respond, and he did. But I didn't say he had to. So you're jumping ahead and talking about the remedy. We aren't anywhere near that." Defense counsel stated, "I think we can continue with the voir dire process. I don't think we have to stop here. We can review the transcripts at any time." The court stated, "I disagree with that. I think we should face the issue when it's raised, and that's now." Court was then adjourned.

The following morning, defense counsel argued that it had made a prima facie showing of discrimination, and stated, "It is my belief that this court needs to make the people justify their decisions." Defense counsel then called defendant as a witness to testify outside the presence of the jury as to his French, Italian, Irish, and American Indian heritage. Following this testimony, the court reiterated what it had said the day before, that defendant was entitled to make a *Wheeler* motion regardless of his own racial heritage.

The court then stated that it was not "satisfied that a prima facie case of discrimination has been made out sufficient to require the prosecutor to justify." The court explained that while defendant had made a complete record, and demonstrated that the persons excluded were members of a cognizable subgroup, he had failed to demonstrate that "there is a strong likelihood that these people have been excluded because of their group association rather than because of a specific bias."

The court stated that it had reviewed the transcripts of *Hovey* voir dire which had occurred several weeks earlier to refresh its recollection, and that

it remembered "very well how the court handled this." In response to prosecution challenges for cause, the judge had strictly complied with the "Witherspoon and Witt standard." (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]; *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844]; see *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250].) The judge stated that "all three of these people [were] on are my list of ones that I expected the People to use peremptory challenges on" because of their demeanor and reservations against the death penalty. Accordingly, he was "not satisfied at all that any of these three jurors have been excluded because of their Hispanic or Spanish surnames or because of their race. You have failed to convince me that there is a likelihood that they are being challenged because of their group association, rather than because of their specific answers to questions in the *Hovey* voir dire."

The court continued, "So I will not require the district attorney to justify his use of the peremptory challenge up to this point. I recognize that to a certain extent he already did that when I asked him at the bench if he wanted to respond to your objection. I assumed he was going to tell me that he didn't think you had made a prima facie case. But instead he began to justify the challenge. That doesn't change the fact that the court did not require him to do so and I am not convinced that a prima facie case has been made out, for the reasons indicated." The court then denied the *Wheeler* motion, noting, "I think it is significant that we aren't anywhere near finished with this process."

b) *Analysis*

██ "It is well settled that the use of peremptory challenges to remove prospective jurors solely on the basis of a presumed group bias based on membership in a racial group violates both the state and federal Constitutions." (*People* v. *Turner* (1994) 8 Cal.4th 137, 164 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *People* v. *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277; *Batson* v. *Kentucky* (1986) 476 U.S. 79, 89 [90 L.Ed.2d 69, 82-83, 106 S.Ct. 1712]; see *J.E.B.* v. *Alabama* ex rel. *T.B.* (1994) __ U.S. __, __ [128 L.Ed.2d 89, 96-97, 114 S.Ct. 1419, 1421].) Under *Wheeler* and *Batson*, " '[i]f a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, . . . he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he must

show a *strong likelihood* that such persons are being challenged because of their group association . . . .' " (*People* v. *Howard* (1992) 1 Cal.4th 1132, 1153-1154 [5 Cal.Rptr.2d 268, 824 P.2d 1315], italics in original; *People* v. *Turner, supra,* 8 Cal.4th at p. 164.)

When a trial court denies a *Wheeler* motion because it finds no prima facie case of group bias was established, the reviewing court considers the entire record of voir dire. (*People* v. *Crittenden* (1994) 9 Cal.4th 83, 116 [36 Cal.Rptr.2d 474, 885 P.2d 887].) "If the record 'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question, we affirm." (*People* v. *Howard, supra,* 1 Cal.4th at p. 1155, quoting *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1092 [259 Cal.Rptr. 630, 774 P.2d 659].)

■ The penalty retrial in this case preceded our decision in *People* v. *Fuentes* (1991) 54 Cal.3d 707 [286 Cal.Rptr. 792, 818 P.2d 75], in which we concluded that the trial court's statement that before trial, it would " '*have the reasons set forth by the People,*' " and the court's instructions following voir dire that the prosecutor obtain his records and justify his challenges, "clearly indicate[d] that the court had *implicitly* found a prima facie case of improper exclusion on the basis of race," despite its contrary ruling on the following day. (*Id.* at pp. 715, 716, italics in original.) We stated that under these circumstances the issue of whether a prima facie case was established was moot. (*Id.* at p. 717.)

We have since clarified that when a trial judge expressly rules that a prima facie case was not made, and then for purposes of completing the record in case the court on appeal disagrees with this conclusion, asks the prosecutor for his or her justifications, the issue of whether a prima facie case was made is not moot. (*People* v. *Turner, supra,* 8 Cal.4th at pp. 166-167.) That is the situation here. The trial judge did not ask the prosecutor to state his reasons, as the trial judge did in *Fuentes.* The prosecutor, however, did so. The trial judge then observed that he had not solicited these reasons, and that no finding of a prima facie case had been made. He then took the matter under submission, and independently reviewed the transcripts. The next day, after hearing oral argument from defense counsel regarding whether a prima facie case had been demonstrated, and testimony from defendant, the trial court expressly found that no prima facie case had been established requiring the prosecutor to justify his challenges.

We conclude that under these circumstances the issue of whether a prima facie case has been established is not moot. ■ A trial judge who asks a prosecutor to respond to a *Wheeler* motion is not required to forcibly

interrupt the prosecutor when the response concerns not whether a prima facie case was made, but the prosecutor's reasons for exercising his peremptory challenges, in order to retain his or her discretion to determine whether a prima facie case was established. "Thus, when an appellate court is presented with such a record, and concludes that the trial court properly determined that no prima facie case was made, it need not review the adequacy of counsel's justifications for the peremptory challenges." (*People v. Turner, supra,* 8 Cal.4th at p. 167.)

◼ Second, we conclude that the trial court acted within its discretion in determining defendant had failed to demonstrate a prima facie case of discrimination. In particular, defendant failed to establish from all the circumstances of the case a strong likelihood that Salcido, Venegas, and Flores were challenged because of their group association. (*People v. Howard, supra,* 1 Cal.4th at p. 1154.) Rather, the only basis for establishing a prima facie case cited by defense counsel was that three of the six challenged prospective jurors had Hispanic surnames. This is insufficient. (*People v. Turner, supra,* 8 Cal.4th at p. 167; *People v. Rousseau* (1982) 129 Cal.App.3d 526, 536 [179 Cal.Rptr. 892] [defense counsel's statement that " 'there were only two blacks on the whole panel, and they were both challenged by the district attorney' " failed to establish a prima facie case]; see *People v. Howard, supra,* 1 Cal.4th at pp. 1154-1155; *People v. Dominick* (1986) 182 Cal.App.3d 1174, 1193-1196 [227 Cal.Rptr. 849].) Indeed, as defense counsel noted, there were a number of Hispanics remaining in the venire.

Of course, a trial court should not "blind itself to everything except defense counsel's presentation." (*People v. Howard, supra,* 1 Cal.4th at p. 1155.) Here, the trial judge, who had observed the voir dire, was in the best position to determine under "all the relevant circumstances" of the case whether there was a " 'strong likelihood' " these prospective jurors were being challenged "because of their group association." (*People v. Howard, supra,* 1 Cal.4th at p. 1156; see *People v. Johnson* (1989) 47 Cal.3d 1194, 1221 [255 Cal.Rptr. 569, 767 P.2d 1047].) The record, reviewed independently by the trial court, clearly established specific nonrace-related reasons, i.e., the prospective jurors' aversion to the death penalty and their demeanor, why a prosecutor might want to excuse these prospective jurors. (*People v. Bittaker, supra,* 48 Cal.3d at p. 1092.)

During *Hovey* voir dire prospective juror Loretta Salcido was asked by the court, "Is there anything about the possibility of imposing either the death penalty or the penalty of life without possibility of parole which causes you to have such strong feelings you feel you would automatically vote for one

or the other?" Salcido responded, "Yes, there is. . . . I haven't thought it out clearly, but I don't think I believe in death." The court inquired, "All right. You don't believe that the law should allow for a death penalty; is that what you mean?" Salcido answered, "Probably. I haven't thought very much about it because I've never been on a—where I had to make a decision, but I would—I wouldn't like to pass the death sentence." After further discussion with Salcido, the court asked, "Are you saying that in any case you would not vote for death?" Salcido responded, "I wouldn't—no, I probably wouldn't, even in any case." Salcido then indicated she would need to think more about it before she could "make up my mind whether I definitely would never vote for the death penalty." The judge and Salcido agreed that she would go to the court cafeteria for 30 minutes to consider the issue. Salcido subsequently indicated she "could pass the death sentence."

Prospective juror Carlos Venegas, when asked on *Hovey* voir dire how he had voted on the 1978 death penalty initiative, said that he had "voted to ban it." When asked why he voted to ban it, Venegas said, "I felt I wanted a society that—that could deal with the problems without resorting to this brutal penalty." "Do you feel that to execute somebody for something they have done is a brutal way to deal with it?" "It's kind of last resort, yes."

Prospective juror Roman Flores, in response to the question on *Hovey* voir dire whether he had an opinion about the death penalty, responded, "Well, I would have to say that there's a lot of things to be considered. It's the highest punishment one can receive. . . . I'd have to be very careful in making a decision—or coming to a decision. And if I'm not—oh, if I'm not with the other jurors on the decision that they're making, I—I'll stick to my guns, if I don't think something is right, and I'll have to go that way. They have got to convince me or I've got to be convinced that it's the right thing. It's the taking of a life." Flores conceded that the subject of the death penalty "kind of overwhelm[ed]" him. He agreed with the prosecutor that he was an actively religious person, and that his "religious belief [was] anti-capital punishment or anti-death penalty." He stated that he "might not believe everything that my religion teaches," he thought there should be a death penalty, and that he would be open to imposing either sentence. The prosecutor's challenge for cause, based not "on any specific answer . . . [b]ut rather his demeanor and the hesitation on certain things," was denied.

Contrary to defendant's assertion, we have previously upheld the prosecutor's exercise of peremptory challenges against death penalty skeptics— i.e., prospective jurors who, although not excusable for cause nevertheless expressed reservations about the death penalty. (*People* v. *Pride* (1992) 3 Cal.4th 195, 230 [10 Cal.Rptr.2d 636, 833 P.2d 643].) We see no reason to

reconsider that conclusion here. In addition, peremptory challenges are properly made in response to " ' "bare looks and gestures," ' " or the demeanor of a prospective juror. (*People* v. *Turner, supra*, 8 Cal.4th at p. 171; *People* v. *Wheeler, supra*, 22 Cal.3d at p. 276.) Finally, a juror who indicates he or she may tenaciously cling to an opinion regardless of the evidence or the views of other jurors constitutes a legitimate concern for the prosecution, which seeks a jury that can reach a unanimous verdict. (See *People* v. *Turner, supra*, 8 Cal.4th at p. 170.)

Defendant contends that the trial court's ruling is not entitled to deference because the court reviewed the *Hovey* voir dire transcripts before making its ruling. Not so. Here, *Hovey* voir dire occurred several weeks before the general voir dire. The trial court's diligence in reviewing the transcripts to refresh its recollection does not negate the fact that it had observed the entire voir dire process, and was therefore in the best position to determine whether a prima facie case had been established. Nor do we agree with defendant that no deference is due because the trial court acted under a misapprehension of the law. No such misapprehension is apparent.

### 3. *Voir Dire Limitations*

Defendant contends the trial court committed reversible error in restricting questioning of the jury during *Hovey* voir dire. (*Hovey* v. *Superior Court, supra*, 28 Cal.3d at pp. 80-81.) No abuse of discretion occurred.

#### a) *Sexual Victimization*

Defendant first contends the trial court improperly denied his motion to conduct voir dire of the prospective jurors as to any sexual victimization they may have experienced. In fact, defendant's motion below was limited to childhood experiences of the prospective jurors, or those close to the jurors. The trial court denied the motion based on the weakness of the showing of the relevance of childhood sexual victimization to the death-qualifying process in this case. There was no error.

The purpose of *Hovey* voir dire is to ascertain whether any prospective juror has such conscientious or religious scruples about capital punishment that his or her views would prevent or substantially impair adherence to the instructions and the juror's oath. (*People* v. *Clark* (1990) 50 Cal.3d 583, 596 [268 Cal.Rptr. 399, 789 P.2d 127].) The inquiry "seeks to determine only the views of the prospective jurors about capital punishment in the abstract, to determine if any, because of opposition to the death penalty, would 'vote *against* the death penalty without regard to the evidence produced at trial.' " (*Id.* at p. 597, italics in original.) However, "[a] prospective

juror who would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances, is therefore subject to challenge for cause." (*People* v. *Kirkpatrick* (1994) 7 Cal.4th 988, 1005 [30 Cal.Rptr.2d 818, 874 P.2d 248].)

▮ In this case, no evidence regarding defendant's sexual victimization of children was anticipated. Rather, both the sodomy of James B., and any inference of sexual violence arising from Lingle's impalement by the stake, were committed against adults. The trial court acted within its discretion in concluding that inquiry regarding the prospective jurors' childhood sexual victimization experiences was too remote from the issues at hand. (See *People* v. *DeSantis, supra,* 2 Cal.4th at pp. 1217-1218 [refusal to allow voir dire questioning about specific crimes that would cause prospective juror to vote automatically for death]; *People* v. *Hovey, supra,* 28 Cal.3d at p. 81, fn. 137.) Moreover, contrary to defendant's assertion, the trial court expressly stated that it was not deciding what questions could be asked during general voir dire. Thus, defendant was not precluded from attempting to show during general voir dire that a prospective juror harbored any specific bias that would cause him or her to vote for the death penalty without regard to the evidence presented, and thus should be excused for cause.[5] (*People* v. *Clark, supra,* 50 Cal.3d at p. 597.)

b) *Torture Allegation*

▮ Defendant next asserts that the trial court erred in limiting counsel to informing the prospective jurors that defendant had been convicted of first degree murder and that the special circumstance of torture murder had been found true, and prohibiting mention of the specific facts surrounding the torture murder, in violation of his Sixth Amendment right to a fair trial.

No abuse of discretion is apparent. Counsel was permitted to explore the subject of torture with the prospective jurors in an effort to determine if that issue would cause the jurors to automatically vote for or against the death penalty regardless of the evidence. It was not required that they also question the prospective jurors regarding the precise scenario of torture murder presented in this case. (*People* v. *DeSantis, supra,* 2 Cal.4th at pp. 1217-1218.) Moreover, contrary to defendant's assertion, it is apparent from the record that the trial court was only discussing limitations on *Hovey,* not general, voir dire. Thus, defendant was not precluded from attempting to show during general voir dire that a prospective juror harbored any specific bias that would cause him or her to vote for the death penalty without regard to the evidence presented, and thus should be excused for cause. (*People* v. *Clark, supra,* 50 Cal.3d at p. 597.)

---

[5]To the extent that defense counsel's oral argument on the motion sought to change the subject of inquiry from childhood sexual victimization to any sexual victimization, the trial court's ruling similarly did not preclude inquiry on general voir dire.

### 4. *Jury Cross-section Claim*

■ Defendant contends that exclusion for cause of prospective jurors who oppose the death penalty abridges his right to a jury chosen from a representative cross-section of the community. Defendant did not raise this issue below, and it was therefore waived. (See *People* v. *Mickey* (1991) 54 Cal.3d 612, 662-663 [286 Cal.Rptr. 801, 818 P.2d 84].)

On the merits, we have repeatedly held to the contrary. (E.g., *People* v. *Mickey, supra,* 54 Cal.3d at p. 662; *People* v. *Hamilton* (1988) 46 Cal.3d 123, 136 [249 Cal.Rptr. 320, 756 P.2d 1348]; *People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 [197 Cal.Rptr. 803, 673 P.2d 680].) The United States Supreme Court has likewise held that the fair cross-section requirement is not violated by "death qualification" of a jury. (*Lockhart* v. *McCree* (1986) 476 U.S. 162, 177 [90 L.Ed.2d 137, 150, 106 S.Ct. 1758]; see also *Holland* v. *Illinois* (1990) 493 U.S. 474, 483 [107 L.Ed.2d 905, 918, 110 S.Ct. 803].) Defendant cites no persuasive reason to revisit our conclusions.

### C. *Challenged Evidentiary Rulings*

Defendant challenges numerous trial court evidentiary rulings. None of these claims have merit.

### 1. *Admission of Certain Exhibits*

■ Defendant asserts that the trial court improperly admitted certain exhibits in violation of defendant's right to a fair trial, impartial jury, due process, and heightened capital case due process guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments. In particular, he challenges the admission of crime scene and autopsy photographs of the "victim's dead and naked body," and certain physical evidence, i.e., the victim's clothing retrieved from the crime scene and his motorcycle, that were "indescribably inflammatory and utterly devoid of probative value." Defendant has waived this claim by failing to object. (*People* v. *Williams* (1988) 44 Cal.3d 883, 906 [245 Cal.Rptr. 336, 751 P.2d 395]; Evid. Code, § 353.)

The claim is also meritless. We have held that because evidence of violent crimes is expressly made admissible by factor (b) of section 190.3, the court has no discretion under Evidence Code section 352 to weigh the prejudicial impact of such evidence against its probative value when it is offered at the penalty phase. (*People* v. *Karis* (1988) 46 Cal.3d 612, 641 [250 Cal.Rptr. 659, 758 P.2d 1189].) Here, the challenged evidence, which illustrated the precise nature of the crime, was not admissible under section 190.3, factor

(b), but it was admissible under factor *(a)*. Section 190.3, factor (a), expressly makes admissible evidence of the "circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true . . . ." Accordingly, just as the trial court did not have discretion under Evidence Code section 352 to exclude evidence expressly made admissible by section 190.3, factor (b), at the penalty phase on the basis that it was unduly inflammatory or lacking in probative value, it similarly lacked discretion to exclude evidence expressly made admissible under factor (a) on this basis. The trial court does, however, retain its inherent discretion to exclude evidence admissible under factor (a) based on the form of the evidence, i.e., that a particular photograph or piece of clothing was inaccurate or cumulative. (*People* v. *Freeman* (1994) 8 Cal.4th 450, 512 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888].)

### 2. *Expert Testimony Issues*

 Defendant challenges the trial court's rulings regarding the testimony of certain expert witnesses. We conclude none of these contentions have merit.

### a) *Soil Testimony*

Defendant asserts that the trial court improperly admitted the testimony of Skip Pallinick, a prosecution soil expert. In fact, while the court ruled that Pallinick would be permitted to testify in a limited capacity, the prosecution chose not to present him as a witness in light of the trial court's ruling. Because Pallinick never testified before the jury, the trial court's ruling could not have prejudiced defendant.

### b) *Homicide Investigator's Testimony*

Defendant contends that the trial court improperly limited the testimony of Officer Ronald Veach, a former homicide investigator with the Irvine Police Department called by the prosecution. This contention is meritless.

### 1) *Background*

At trial immediately prior to Officer Veach's testimony, the prosecutor moved to limit Veach's testimony with respect to his conclusion as to whether Lingle was impaled by the stake ante mortem or post mortem. In his police report, Veach had stated that he believed Lingle was impaled post mortem. A foundational hearing was then held.

At the hearing, Veach testified that he had no medical training or training in either pathology or serology; accordingly his knowledge of causes and

time of death was limited and general in nature. He had viewed only eight corpses in the two years he had been an investigator. Veach had never, prior to Lingle, "seen a body with something inserted in the rectum." He reached the conclusion that Lingle had been impaled post mortem because there was no bleeding around the anal orifice. After the autopsy was performed, and Veach learned the results, he came to a different conclusion as to when she had been impaled.

Following this testimony, the trial court stated, "So, I see him as totally unqualified in this case to render an expert opinion on the subject to which we are talking about here. He may be an excellent homicide investigator. He may be an excellent crime scene investigator. But the court has to look at the specific question which is before the court in determining whether a person qualifies as an expert, and I don't think he does." The trial court excluded Veach's opinion that Lingle had been impaled by the stake post mortem.

### 2) Analysis

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) ██ " 'The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown.' " (*People* v. *Cooper* (1991) 53 Cal.3d 771, 813 [281 Cal.Rptr. 90, 809 P.2d 865].)

██ The trial court properly excluded Veach's expert opinion as to when Lingle was impaled. First, Veach lacked the qualifications necessary to render such an opinion. He had no medical, serology, or pathology training. He had viewed only eight corpses in the two years he had been a homicide investigator, none of which involved a similar injury. He also had only a limited understanding of the manner in which the cause and time of death is clinically determined. In sum, the trial court did not abuse its discretion in limiting Veach's expert testimony.

### c) Impeachment of Defense Pathologist

Defendant asserts that the trial court improperly allowed impeachment of defense expert pathologist Dr. Ronald Kornblum, and that the probative value of this evidence was substantially outweighed by its prejudicial impact. Defendant has waived his claim under Evidence Code section 352, and his other contention is meritless.

On cross-examination, the prosecutor inquired of Dr. Kornblum, who was also the Los Angeles County Medical Examiner, "When you work independently, I take it you don't use county time or county facilities or things like

that to do your own independent work?" Kornblum responded, "Correct." Over defense objection, the district attorney then asked Kornblum if he had asked a relative who was an employee of the Los Angeles County Crime Lab, to have a plug from the wooden stake tested. Kornblum conceded he had done so, but that he thought the testing had occurred on a Saturday.

Defense counsel argued that the relative would not be called to testify and Dr. Kornblum did not rely on the results of this testing in formulating his opinion. He did not object under Evidence Code section 352. The trial court overruled the objection, stating that the impeachment evidence was relevant and probative as to Kornblum's credibility.

We conclude that the trial court properly allowed the prosecution to demonstrate that Dr. Kornblum was not telling the truth when he initially denied using public resources to perform private work in this and other cases. Such evidence tended to show his possible abuse of the public trust to advance his own endeavors as a private expert, and apparent dishonesty in attempting initially to conceal his actions from the jury. Nor, contrary to defendant's further assertion, did the prosecutor commit misconduct in exploring this area.

### 3. *Allocution*

Defendant contends that the trial court erred in denying him the opportunity to address the jury in allocution in violation of his right to due process. In fact, defendant made no such motion in the trial court. Rather, defendant sought to 1) read a prepared statement while he testified, and 2) obtain an advance ruling from the court that if he limited his direct testimony to certain topics, he would not be cross-examined about the Lingle murder.

Defense counsel stated, "So the court understands, . . . we're not asking for anything like allocution. We're proposing that this would be part of his direct. . . . We're not asking him to have the ability to talk to the jury without the right of cross-examination or not under oath." The trial court later stated, when ruling on the motion: "[T]his is not a situation where the defendant wants to take the stand and profess his innocence of the crime and not be subjected to cross-examination. . . . as I understand your offer of proof, that is not going to be the situation here." Defense counsel responded, "Correct, your honor." The trial court ruled that defendant would be allowed

to read his statement, and noted that the prosecution would have the opportunity to cross-examine him regarding that testimony. The court declined to issue an advance ruling regarding the scope of cross-examination.[6]

In any event, we have repeatedly held that a capital defendant has no right to address the penalty phase jury in allocution, immune from cross-examination by the People. (*People* v. *Clark* (1993) 5 Cal.4th 950, 1036-1037 [22 Cal.Rptr.2d 689, 857 P.2d 1099]; *People* v. *Nicolaus* (1991) 54 Cal.3d 551, 583 [286 Cal.Rptr. 628, 817 P.2d 893]; *People* v. *Keenan* (1988) 46 Cal.3d 478, 511 [250 Cal.Rptr. 550, 758 P.2d 1081].) Defendant asserts no reason for us to revisit that conclusion.

### D. *Prosecutorial Misconduct Claims*

Defendant contends that the prosecutor committed misconduct on numerous occasions. Most of these claims were waived, and none of them have merit.

#### 1. *Voir Dire*

Defendant contends that the prosecutor committed misconduct during general voir dire in violation of his right to an individualized and reliable penalty determination, due process, and heightened capital case due process, under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Not so.

Defendant first contends the prosecutor attempted to obviate defendant's "lingering doubt defense" regarding the torture-murder special circumstance by informing prospective jurors during general voir dire that defendant had been found guilty of first degree murder with the special circumstance of torture, that they must accept this verdict, and that they need not concern themselves with the concept of proof beyond a reasonable doubt.

We reject defendant's claims at the outset because he "failed to satisfy the general rule requiring assignment of misconduct and request for admonition as to any of the comments by the prosecutor of which he now complains," and no exception is applicable. (*People* v. *Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40]; *People* v. *Clair* (1992) 2 Cal.4th 629, 664 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

We also reject defendant's claim on the merits. We have reviewed the prosecutor's challenged comments and discern no misstatement of law and

---

[6]Defendant testified, but his testimony was limited to authenticating his artwork. He did not read the prepared statement.

certainly no misconduct. As we have repeatedly stated, at the penalty phase, defendant's guilt beyond a reasonable doubt is established. (*People* v. *Cain* (1995) 10 Cal.4th 1, 66 [40 Cal.Rptr.2d 481, 892 P.2d 1224] [penalty jury "has no cause to deliberate further on whether any of them harbor reasonable doubt as to guilt or truth of the special circumstances"].)

Here, the prosecutor properly informed the prospective jurors that defendant had already been found guilty of first degree murder with the special circumstance of torture murder. Thus, their duty would be limited to the determination of penalty. The prosecutor did not intimate in any fashion that "lingering doubt" or doubt beyond reasonable doubt as to the truth of the special circumstance could not be considered. Indeed, both sides discussed lingering doubt in their closing arguments, and the jury was ultimately instructed on lingering doubt as to the special circumstance. We presume that the jury followed the court's instructions. (*People* v. *Delgado* (1993) 5 Cal.4th 312, 331 [19 Cal.Rptr.2d 529, 851 P.2d 811]; *People* v. *Mickey*, *supra*, 54 Cal.3d at p. 689, fn. 17.)

Next, defendant claims the prosecutor undermined defendant's lingering doubt defense by "insinuating . . . that jurors should not be concerned by the many things which they would never know about the crime." Defendant waived this argument by failing to object. (*People* v. *Berryman*, *supra*, 6 Cal.4th at p. 1072.) It is also meritless. We have reviewed the challenged statements. The prosecutor merely pointed out the obvious, that the prospective jurors would not be hearing from the victim, and thus would never know "one hundred percent" of what happened that night. He asked them if they felt unable to vote for the death penalty in a case where they still had questions about "what else occurred at the event." Contrary to defendant's assertion, this statement does not invite jurors to "entirely disregard" any lingering doubt they might have as to the torture-murder special circumstance.

Next, defendant contends that the prosecutor improperly told the prospective jurors that they would choose between two sentences, death and life imprisonment without the possibility of parole, "free from the constraints of any legal guidelines." Defendant waived this argument by failing to object. (*People* v. *Berryman*, *supra*, 6 Cal.4th at p. 1072.)

It is also meritless. The prosecutor stated: "Now, is there—based on that, do you think that, knowing that you are ultimately going to render an opinion or a vote as to the particular penalty, knowing that there is not going to be a specific burden of proof, that it's really going to come down to your particular judgment, is there anything about that that leaves you with a

feeling that, gee, the law's not going to step in and guide me and tell me that, hey, I have to vote for death under this circumstance, so, in essence, it's really going to be placed on my shoulders; do you think you could handle a responsibility like that?" We discern no misstatement of law and certainly no misconduct. Penalty phase jurors do in fact have discretion to decide whether death or life imprisonment without the possibility of parole is the appropriate punishment. Nor is there a reasonable likelihood that the statement could have been understood to mean the jurors would be making the penalty determination "free from the constraints of any legal guidelines." (*People* v. *Clair*, *supra*, 2 Cal.4th at p. 663.) In any event, the jury was properly instructed on the guidelines applicable to making its determination.

Next, defendant asserts that the "prosecutor attempted to condition the jurors to believe that they could or should not vote for life imprisonment rather than death, simply out of sympathy for the defendant." This claim was waived by failure to object. (*People* v. *Berryman*, *supra*, 6 Cal.4th at p. 1072.) It is also meritless.

The prosecutor stated: "This case is a little bit different than most criminal cases in that normally a jury in a criminal trial is instructed that they are not to consider sympathy or passion or prejudice, that they are to make a finding on the facts themselves. Now, in this particular case you may consider sympathy and give or attach to it any credit or weight you believe it is deserving of." The prosecutor then inquired of various prospective jurors whether they would make a penalty decision solely on the basis of sympathy and "automatically disregard" any other evidence, whether they felt the task of weighing aggravating and mitigating factors was "too difficult a task to handle," whether seeing the defendant in the courtroom every day would make choosing the death penalty more difficult, and whether their ability to choose a penalty would be affected by the way a defendant appeared in court. These inquiries sought to reveal prospective jurors who did not have an open mind about sentencing; none "condition[ed] the jurors to believe that they could [not] or should not vote for life imprisonment rather than death, simply out of sympathy for the defendant," nor is there a reasonable likelihood that any prospective juror so understood them. (*People* v. *Clair*, *supra*, 2 Cal.4th at p. 663.)

Finally, defendant contends that the prosecutor committed misconduct by "implying that no juror should hold out for a particular penalty and hang the jury." Defendant waived this argument by failing to object. (*People* v. *Berryman*, *supra*, 6 Cal.4th at p. 1072.) It is also meritless.

The prosecutor stated: "Although both the defense and the people are entitled to your individual verdict, before there can ever be a verdict in this

case, it has to be a unanimous finding by all twelve people. So if one person gets back in that deliberation room and says, 'Hey, this is my decision, and I'm going to be reading this book and when you people come around my way, let me know,' that one side is going to suffer one way—both sides are going to suffer, actually, because even though that person is rendering their individual verdict, they are not deliberating with, they're not attempting to listen to the other jurors in an attempt to reach a verdict in the case."

Contrary to defendant's assertion, nothing in this statement urged the prospective jurors not to vote as they thought the evidence as a whole indicated, or "that any decision would be the right one if the eleven other jurors agreed with it." Nor is there a reasonable likelihood that any prospective juror so understood the statement. (*People* v. *Clair, supra,* 2 Cal.4th at p. 663.) Rather, the prosecutor simply commented on the jury's duty to deliberate in good faith in attempting to reach a unanimous verdict.

### 2. *Opening Statement*

■ Defendant contends the prosecutor committed a variety of errors amounting to misconduct during his opening statement. All of these claims were waived, and none of them have merit.

#### a) *Reference to Defendant as a "Biker"*

Defendant contends that the prosecutor committed misconduct by characterizing defendant as a "biker" in violation of his First Amendment guarantee of freedom of association, and for the purpose of inflaming and biasing the jury. Defendant waived this argument by failing to object. (*People* v. *Berryman, supra,* 6 Cal.4th at p. 1072.)

It is also meritless. The prosecutor stated: "You will hear that Mr. Davenport also went by the name of Dave or Honda Dave. As you can see in the court well right now, there is a Honda 350, which at the time and on that particular evening was owned by Mr. Davenport and that was his means of transportation. You will hear that Mr. Davenport, among other things, was an individual who liked to frequent a bar . . . for individuals who are biker types—biker-type individuals, a biker bar or motorcycle enthusiast."

Contrary to defendant's assertion, there is no reasonable likelihood that any prospective juror understood this statement to imply that defendant was a member of a "dangerous motorcycle gang." Moreover, remarks made in an opening statement cannot be charged as misconduct unless the evidence referred to by the prosecutor was so patently inadmissible as to charge the

prosecutor with knowledge that it could never be admitted. (*People* v. *Wrest* (1992) 3 Cal.4th 1088, 1108 [13 Cal.Rptr.2d 511, 839 P.2d 1020].) Here, evidence that the Sit 'N Bull Bar was frequented by motorcycle enthusiasts or "bikers," and that defendant relied on a motorcycle as his means of transportation, scarcely can be characterized as "patently inadmissible"; defendant does not attempt to argue otherwise.

### b) *"Prediction" of Defense Evidence*

Defendant contends that the prosecutor improperly predicted both that defendant would testify, "thereby setting the stage for a negative inference if [defendant] exercised his constitutional right to refrain from testifying," and the defense defendant would present, in violation of his Fifth Amendment privilege to remain silent, and his right to due process, a fair trial, the assistance of counsel, and a reliable and nonarbitrary penalty determination. Defendant waived this argument by failing to object. (*People* v. *Berryman*, *supra*, 6 Cal.4th at p. 1072.)

It is also meritless. The prosecutor's statements were no more than fair comment on what he anticipated would be defense strategy and the evidence adduced at trial; there is no reasonable likelihood that the jurors would have construed the statements as impermissible comment on defendant's failure to testify. (*People* v. *Clair*, *supra*, 2 Cal.4th at pp. 662-663; *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].) Moreover, the challenged statements by defendant that the prosecutor referred to in his opening statement were introduced through the testimony of the police officer who interrogated defendant. Nor, contrary to defendant's assertion, did the prosecutor's statements shift any burden of proof to the defense, or present the prosecutor as having knowledge of special facts, thus improperly inviting reliance on his views instead of on the evidence.

Defendant also asserts that the prosecutor improperly argued that the reason defendant "felt free to lie [on the stand] was because he had learned to murder his victims so that they couldn't contradict him." Once again, defendant waived this argument by failing to object. (*People* v. *Berryman*, *supra*, 6 Cal.4th at p. 1072.)

It is also meritless. The prosecutor stated: "You will hear of a few of the other lies that Mr. Davenport will tell the police, that did not check out. The evidence is going to show that really what happened is Mr. Davenport learned an invaluable lesson about five years before this incident. The evidence is going to show that Mr. Davenport had another victim who lived to identify him." Nothing in this statement constitutes a prediction that defendant would testify, much less a prediction that he would perjure himself. Rather, the prosecutor's statement simply and properly referred to what he expected the evidence to show.

### c) *Prosecutorial Stance on Sexual Character of Offense*

▅▅▅▅ Defendant contends the prosecutor improperly changed his position regarding the sexual character of the crime in violation of defendant's due process rights. Defendant waived this argument by failing to object. (*People v. Berryman, supra,* 6 Cal.4th at p. 1072.)

It is also meritless. As defendant acknowledges earlier in his brief in this court, during *Hovey* voir dire "the prosecution took the position that voir dire concerning prospective jurors' adult experiences with sexual victimization were relevant, but that *childhood* experiences were not." (Italics added.) During his opening statement, the prosecutor said: "Now later on Mr. Davenport will somewhat deny this and try and paint a picture of just being there and not really having much interest in [Lingle]. But I believe the evidence will demonstrate, throughout the course of the trial, Mr. Davenport had a real interest in her that night and was attempting to make a hustle for her." Given that Lingle was 28 years old at the time of her death, and the sexual overtones of the crime, no inconsistency is apparent.

### d) *Reference to Certain Exhibits*

Defendant contends that the prosecutor improperly referred in both his opening statement and closing argument to certain "inflammatory and irrelevant items of evidence" discussed *ante,* in part II.C.1. Defendant waived this argument by failing to object. (*People* v. *Berryman, supra,* 6 Cal.4th at p. 1072.)

The claim is also meritless. As we have already discussed, these items were properly admitted; hence the prosecutor did not commit misconduct in either referring to or emphasizing them. (*People* v. *Wrest, supra,* 3 Cal.4th at p. 1108.)

### 3. *Examination of Witnesses*

▅▅▅▅ Defendant contends that the prosecutor committed misconduct in the examination of two witnesses, Patricia Moore and Dr. Fukomoto, when he "bullied them, put words into their mouths, and effectively testified himself." We reject defendant's claims at the outset because he "failed to satisfy the general rule requiring assignment of misconduct and request for admonition as to any of the comments by the prosecutor of which he now complains," and no exception is applicable. (*People* v. *Berryman, supra,* 6 Cal.4th at p. 1072.) Moreover, as discussed below, the claims are meritless.

a) *Patricia Moore*

Defendant contends that in questioning Patricia Moore, the prosecutor "resorted to extreme persistent leading, putting words into the witness's mouth and pressing her to accept them." Not so.

Moore testified at both the first trial and the penalty retrial. At the penalty retrial she testified that on her way home from work at approximately 12:30 a.m. on March 27, 1980, she saw a motorcycle and a man who appeared to be digging in the field where Lingle's body was found. She identified that man as defendant.

The record reveals that in addition to the difficulty of testifying to events that occurred nine years earlier, Moore was a fearful and reluctant witness. She conceded at the penalty retrial that she had failed in the first trial to identify defendant as the only person in two different photographic lineups whom she believed to be the person in the field, as well as in-court at the first trial, because of pressure from her husband and fear for her family's safety. While Moore did not make an in-court identification of defendant, she did ultimately testify at the first trial that the person in the field was the same person shown in one of the photographs used in the lineups. That photograph was of defendant.

The prosecutor elicited this concession and the motivation underlying it presumably to defuse or prevent defense impeachment with the same information. Such a tactic is clearly permissible on direct examination. (*People* v. *Hardy* (1992) 2 Cal.4th 86, 171 [5 Cal.Rptr.2d 796, 825 P.2d 781].) Contrary to defendant's assertion, the prosecutor did not place "special emphasis on facts purportedly known to himself," "create, from the whole cloth, an eye witness identification placing Davenport at the crime scene, where none otherwise would have existed," or insinuate that defendant "could cause harm to innocent children as long as he lived, even if incarcerated." Nor, as defendant asserts, did the questioning improperly affect defendant's lingering doubt defense, which in any event was focused solely on the torture-murder special circumstance and not defendant's guilt.

b) *Dr. Fukomoto*

Defendant contends the prosecutor employed aggressive leading questioning to elicit the desired testimony from Dr. Fukomoto that Lingle was alive when she was impaled by the stake. This claim is meritless.

Contrary to defendant's assertion, Fukomoto did not imply in his testimony that Lingle was impaled by the stake four minutes after her heart

stopped, and then change that testimony out of "misunderstanding or simple desire to give the prosecutor the testimony he wanted." Rather, Fukomoto testified consistently and repeatedly that in his opinion Lingle was impaled while she was alive. On cross-examination, he continued to assert this opinion. Defense counsel then elicited testimony that Lingle's heart could have stopped anywhere from one to five minutes after the carotid artery was severed. On redirect, the prosecutor asked, "Whatever the time was, whether it was five minutes or one minute from the point that the artery was cut, do we know that, in whatever time there was left, that that stake was impaled before her heart stopped beating?" Fukomoto replied, "Yes, sir." Such questioning simply clarified and reinforced Fukomoto's earlier testimony. There was no misconduct.

### 4. Closing Statement

Defendant complains of several instances of alleged misconduct by the prosecutor during closing argument. None of these claims have merit.

#### a) Alleged Assertion of Personal Knowledge and Reliance on Facts Not in Evidence

 Defendant contends that the prosecutor argued the jury should "substitute his own recollection of the testimony of the prosecution's pathology expert from the guilt phase trial, in place of the testimony of either pathologist called to testify at the penalty phase retrial." Defendant waived this argument by failing to object. (*People* v. *Berryman*, *supra*, 6 Cal.4th at p. 1072.) It is also meritless.

Dr. Fukomoto testified on rebuttal that because tissue slides were available, he had not formed a definite opinion regarding whether Lingle was alive when she was impaled by the stake until he examined the slides. Fukomoto examined the slides on April 11, 1989, the day before his testimony in the prosecution's case-in-chief. On the evening of April 10, after viewing the slides, he spoke to the prosecutor to tell him his conclusion. The prosecutor's opening statement was on April 5, 1989. On cross-examination, the following colloquy ensued between Fukomoto and defense counsel: "So [the prosecutor] started this trial not having any idea what you were going testify to." "I think he's pretty close to it." "He just kind of winged it?" "Well, I don't know what he did."

Defendant objects on appeal to two comments by the prosecutor in his closing argument. First, the prosecutor stated: "In this case you know Dr. Fukomoto was cross-examined about whether or not—when he formulated

his opinion and when he ultimately told me of his opinion on the stake itself and he told you that he told me the night before. Then there was a question about well, then, you told him before [the prosecutor] made his opening statement, which in some way, almost impugns Dr. Fukomoto. Ladies and gentlemen, what I would say to you is before I make an opening statement, you know I have the transcripts. We have gone through all of those transcripts of the prior trial. We know what Dr. Fischer said. The fact that I purport or believe that the evidence is going to demonstrate that, you can't hold Dr. Fukomoto or impugn him in some respect."

The prosecutor also stated, in the context of urging the jurors to not credit the testimony of defendant's paid expert pathologist: "We know that the one true pathologist that conducted the autopsy is now dead, is deceased. How easy is it to come in nine years after the fact and to riddle his opinion. He was there. He saw the body, you know. He was being paid for that, 75 bucks an autopsy. Is that guy, for 75 bucks going to come in here and, you know, make all of his findings up or try and sway them? He saw Gayle Lingle. He did the autopsy. He came to the conclusion that that occurred while she was alive, plain and simple."

No misconduct occurred. The first comment indicates that the prosecutor was urging the jurors not to discredit Fukomoto's testimony simply because the prosecutor had stated that the evidence would show that Lingle was alive when she was impaled by the stake during his opening argument, or before Fukomoto's opinion was formed. The second comment simply suggested that there was no basis for harboring a lingering doubt as to the truth of the torture-murder special circumstance in light of Dr. Fischer's autopsy report, which, consistent with Dr. Fukomoto's testimony, indicated that Lingle was alive when impaled. Contrary to defendant's assertion, there is no reasonable likelihood that the jury could have construed either comment as an invitation to substitute the prosecutor's "own recollection of the testimony of the prosecution's pathology expert from the guilt phase trial, in place of the testimony of either pathologist called to testify at the penalty phase retrial." Nor, as defendant also asserts, do the prosecutor's comments constitute vouching for the credibility of the deceased pathologist, improperly "invite jury reliance on the prosecutor's opinion based on his official position and superior knowledge of the facts," or violate defendant's rights to "due process, confrontation, and jury trial."

Moreover, contrary to defendant's further assertion, the prosecutor reasonably inferred that Dr. Fischer had received $75 for the Lingle autopsy based on Dr. Fukomoto's testimony that he had been Dr. Fischer's partner for 25 years, and in particular was his partner at the time of Lingle autopsy, and

that Dr. Fukomoto at the time of the Lingle autopsy was paid $75 for each autopsy he performed. Reference to this modest payment suggested that Dr. Fischer had no motive to fabricate in making his report and that he was therefore more trustworthy than defendant's retained expert, Dr. Kornblum, who opined that Lingle was not alive at the time she was impaled.

### b) *Alleged Invitation to Speculate*

Defendant contends that the prosecutor improperly urged the jury to speculate that defendant behaved poorly in prison and was still violent, that defendant was still a threat to other inmates, that multiple prison sodomies committed by defendant might have gone unreported, that defendant was so "institutionalized" he actually enjoyed his life in prison such that life imprisonment without the possibility of parole would be no punishment for him at all, and that the jury could consider whether defendant was smiling when he stabbed Lingle, in violation of his right to due process. Defendant waived these arguments by failing to object. (*People* v. *Berryman, supra*, 6 Cal.4th at p. 1072.)

They are also meritless. We have reviewed each of the challenged statements, and conclude they were all fair inferences drawn from the evidence. Contrary to defendant's assertion, none of the prosecutor's comments "ask[ed] the jurors to speculate, rather than relying upon the facts proven by the evidence admitted at trial," or "solicited the jurors to disregard the law."

### c) *Alleged Misstatements of Law*

Defendant contends that the prosecutor "invited reversal" by allegedly misstating the law on several occasions. None of these claims have merit.

### 1) *Torture*

Defendant contends that the prosecutor misstated the law by arguing that the stabbing alone, without impalement by the stake while Lingle was alive, constituted torture. Defendant waived this argument by failing to object. (*People* v. *Berryman, supra*, 6 Cal.4th at p. 1072.) It is also meritless.

In the context of discussing defendant's lingering doubt claim, the prosecutor stated: "But remember this, ladies and gentlemen, evidence of torture, and I will get to that stake in a moment, is not limited to just the stake." The prosecutor then read the elements of the torture-murder special circumstance, and asked, "Did the perpetrator intend to inflict extreme physical pain and suffering upon a person? You think when a person is being beaten

over their whole body, as the evidence says, that the intent is to inflict extreme physical pain? How about when you are plunging that knife over and over, especially when the person is trying to defend themselves, do you think that is extreme physical pain? Ladies and gentlemen, I would suggest to you there is no question in this case, and I am going to argue just as I did in this case, that the stake was inserted into her while she was alive. But assuming for a moment you had a lingering doubt, ladies and gentlemen, there is no question but that there was torture here." After discussing the various pathologists and their testimony, the prosecutor concluded, "But the point is, you know, do any of you have a doubt whether or not that woman suffered extreme suffering for any prolonge[d] period of time, . . . you know, that beating, the knifing and the stake. . . . The point is this: Ladies and gentlemen, assume for argument that you possess a lingering doubt, whether or not the stake is pre- or post-death, do you think that mitigates the crime in any way?"

No misconduct occurred. The prosecutor properly argued that the vicious beating and knife wounds endured by the victim while she was alive and struggling with her attacker would support a finding of torture. (See *People v. Crittenden, supra*, 9 Cal.4th at pp. 139-141 [multiple nonfatal stab wounds sufficient to show torture pursuant to § 190.2, subd. (a)(18)].) The instructions permitted the jury to consider this evidence in assessing the circumstances of the crime and in determining whether they had a lingering doubt as to the validity of the torture-murder special circumstance. (*People v. Cain, supra*, 10 Cal.4th at p. 66.)

### 2) *Lack of Remorse*

Defendant contends that the prosecutor's argument regarding defendant's lack of remorse constituted *Griffin* error (*Griffin v. California, supra*, 380 U.S. 609), and "transformed lack of remorse into a non-statutory aggravating factor." Not so.

The prosecutor stated: "Ladies and gentlemen—you know, later on I am going to address the factors in mitigation and one of the things you can consider when you look at whether or not there is true mitigation is whether or not there is the presence of remorse. In other words, is a person truly sorry for what they did? Ladies and gentlemen, ask yourself just how sorry Mr. Davenport was for what he had done to Miss Tewes, for what he had done to Miss Lingle as he is awaiting the trial of Miss Lingle." At this point, defense counsel objected under *Griffin,* and the objection was overruled. The prosecutor continued, "Just how remorseful is he? I am going to ask you to address that when you look at mitigation; that the remorse or lack thereof will go to whether or not there is mitigation in this case."

To the extent it is applicable at the penalty phase, no violation of *Griffin* occurred. First, defendant did testify at the penalty retrial, but he failed to acknowledge culpability or express remorse for the capital crimes of which he had been convicted. ■ Second, the prosecutor's comments did not refer to defendant's failure to testify; rather they were fair comment on the state of the evidence. (*People* v. *Freeman*, *supra*, 8 Cal.4th at p. 523.) "[I]n the absence of a clear reference to a defendant's failure to testify, a prosecutor is free to make a logical comment on the defendant's lack of remorse." (*People* v. *Breaux* (1991) 1 Cal.4th 281, 313 [3 Cal.Rptr.2d 81, 821 P.2d 585].)

■ Nor did the prosecutor argue that lack of remorse was a factor in aggravation, as defendant contends. Rather, the prosecutor stated that remorse could be considered as a factor in mitigation, but that no such mitigating evidence had been introduced here. This argument was proper. (See *People* v. *Davis* (1995) 10 Cal.4th 463, 537 [41 Cal.Rptr.2d 826, 896 P.2d 119]; *People* v. *Crittenden*, *supra*, 9 Cal.4th at p. 148.) Nor, contrary to defendant's assertion did the prosecutor's statements "creat[e] a false impression that defendant admitted to the murder."

Finally, defendant summarily asserts that the prosecutor violated his constitutional rights by "going through the statutory list of mitigating factors and stating 'this is not here' or words to the same effect." Of course, as with lack of remorse, the prosecutor is free to argue that evidence of any or all mitigating factors is absent. There was no misconduct.

### 3) *Sympathy*

■ Defendant contends the prosecutor improperly told the jury that they should not have sympathy for defendant because he had shown no remorse, had done nothing special to earn sympathy, and because of the nature of the crime. Defendant waived this argument by failing to object. (*People* v. *Berryman*, *supra*, 6 Cal.4th at p. 1072.) It is also meritless. The prosecutor merely argued that in light of certain evidence adduced at the penalty phase defendant did not warrant the jury's sympathy. Defendant was free to argue the opposite, and did so. (*People* v. *Edwards* (1991) 54 Cal.3d 787, 840 [1 Cal.Rptr.2d 696, 819 P.2d 436].) There was no misconduct.

Defendant also argues that the prosecutor misstated the law and committed prosecutorial misconduct in discussing section 190.3, factor (k). Defendant waived this argument by failing to object. (*People* v. *Berryman*, *supra*, 6 Cal.4th at p. 1072.) It is also meritless.

The prosecutor stated: "Then we have kind of a catch-all. That is the 'k factor.' That is what the defense has offered in this case. I suggest to you,

ladies and gentlemen, that the 'k' factor is appropriate. You can consider and give it the weight that you think it is deserving." The prosecutor then read the expanded section 190.3, factor (k) instruction. "So, what do we have here? Basical[l]y under this factor, this encompasses sympathy and pity. As I told you, ladies and gentlemen, that is an appropriate factor for you to consider in this case and I would ask you to do so. I would ask you to listen to any and all of the evidence that was presented by the defense and please give it the weigh[t] you feel it is attached because they are deserving of that right. *However, the mere presentation of this evidence does not mean that it mitigates the crime. It just means that it comes under that category and you are to consider it.*" (Italics added.)

Defendant contends that the italicized portion of the prosecutor's argument misstates the law. It does not. The prosecutor correctly noted that while the jury must consider any and all mitigating evidence, they were not compelled to reach a particular conclusion on the basis of this evidence. No misconduct occurred.

### 4) *Death Penalty*

Defendant contends that the prosecutor improperly informed the jury that the law required the death penalty in this case. Not so. Defendant waived this argument by failing to object. (*People* v. *Berryman, supra,* 6 Cal.4th at p. 1072.)

It is also meritless. The prosecutor stated: "Now, before I comment on the evidence, I have just another comment about your duty as a juror. You took the oath to follow the law, even if you disagreed with the law. Remember the jury selection process. And as I said earlier, you all acknowledged the fact that there was a death penalty law and you acknowledged the responsibility to carry it out if it was appropriate. . . . *Ladies and gentlemen, again I am only going to ask you to accept the fact that justice is a funny notion that cuts both ways. Sometimes the law requires a literal retribution for the taking of a life.* Now, you all told us that you would render your individual verdict in this case . . . . If it is life without parole or if it is the death sentence, please work with the other jurors." (Italics added.)

Defendant relies on the italicized portion of the prosecutor's closing argument in support of his assertion. Placing this language in context, however, it is apparent that the prosecutor simply informed the jury that if it found that the death penalty was the appropriate punishment, it had a responsibility to carry it out. As is evident from his subsequent discussion of the juror's individual verdicts, he did not argue that the law automatically

required the imposition of the death penalty. Moreover, the jury was instructed that it was their "duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the defendant," and that if anything said by the attorneys conflicted with the instructions, they must follow the instructions.

As for the prosecutor's reference to retribution, we have held that " '[i]solated, brief references to retribution or community vengeance . . . , although potentially inflammatory, do not constitute misconduct so long as such arguments do not form the principal basis for advocating the imposition of the death penalty.' " (*People* v. *Wash* (1993) 6 Cal.4th 215, 262 [24 Cal.Rptr.2d 421, 861 P.2d 1107].) The prosecutor's remarks here were not particularly inflammatory, nor did they constitute the principal basis of his argument in favor of the death penalty.

### 5) *Religious References*

 Defendant asserts that the prosecutor's religious references constituted misconduct. Defendant waived this argument by failing to object, and no exception is applicable. (*People* v. *Freeman, supra,* 8 Cal.4th at p. 515; *People* v. *Berryman, supra,* 6 Cal.4th at p. 1072.) It is also meritless.

The prosecutor stated, in reference to what he anticipated might be argued by defense counsel in closing argument: "There might be the suggestion and this has occurred in other cases and I don't know if it will be here that the decision is truly not yours to make but rather in God's province. A lot of us, a lot of times, when we hear that it strikes us. We think, gee, we have always been taught that it is God's province to vote for death and somehow you are playing God. Well, ladies and gentlemen, that is not so. God gave us all free will and free choice. God gave John Davenport free will and free choice. God allowed men to carry out his word. *God gave us Bibles and other things to follow and we as [a] society have decided that through God that what we are doing is not wrong in a very aggravated circumstance.*"

Defendant first contends that the italicized portion of this statement violated the First Amendment separation between church and state, and "cloaked the prosecutor in the mantle of divine authority . . . as if he were a pope" in violation of defendant's rights under the First, Sixth, Eighth, and Fourteenth Amendments. We perceive no such implication in the prosecutor's remarks, however, particularly when viewed in context, and believe there is no reasonable likelihood any juror so construed them.

Defendant further contends that the biblical reference was improper "because it was a very thinly veiled allusion to community conscience and

values" in violation of his right to due process and an individualized assessment of the appropriateness of the penalty. In particular, defendant argues that when the prosecutor said, "we as [a] society have decided through God that what we are doing is not wrong in a very aggravated circumstance," he was saying that capital punishment is morally right, and that "the Orange County jury undoubtedly understood him to say: 'conservative public opinion as embodied by religious right political groups, has reinstated the death penalty in California, and you should accordingly see to it that the death penalty is imposed in this case.'" Again, we perceive no such implication in the prosecutor's remarks, and believe there is no reasonable likelihood any juror so construed them.

Finally, defendant argues that his constitutional rights were violated because the prosecutor told the jurors to follow biblical law, rather than applying the state and federal law embodied in the instructions. "We have generally condemned invocations to a different or higher law than that found in the California Penal Code." (*People* v. *Freeman, supra,* 8 Cal.4th at p. 515.) Here, however, we perceive no such invocation in the prosecutor's comments. Rather, he simply argued that imposition of the death penalty was not usurping God's authority but legitimately carrying out California law. Indeed, the prosecutor reminded the jurors at the beginning of his argument, "You took the oath to follow the law, even if you disagreed with the law."

### 6) *Future Dangerousness*

Defendant contends that the prosecutor improperly implied that defendant had not reformed and represented a future danger to other inmates and "conceivably prison personnel." Defendant waived this argument by failing to object. (*People* v. *Berryman, supra,* 6 Cal.4th at p. 1072.) It is also meritless. "'[W]e have held that argument directed to a defendant's future dangerousness, when based on evidence of the defendant's past conduct rather than expert opinion, is proper . . . .'" (*People* v. *Fierro* (1991) 1 Cal.4th 173, 249 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *Davenport I, supra,* 41 Cal.3d at p. 288.) Contrary to defendant's assertion, the argument did not "implant in the jurors' minds the concept that execution is the only way to protect society."

Defendant argues that future dangerousness is not a statutory aggravating factor. That is correct, and the prosecutor did not present it as such. It is, however, an inference properly drawn from defendant's commission of the underlying crime and evidence of other violent conduct. (Cf. *People* v. *Bean* (1988) 46 Cal.3d 919, 951 [251 Cal.Rptr. 467, 760 P.2d 996].)

### 7) Time of Impalement

Defendant asserts that the prosecutor improperly argued that the time at which Lingle was impaled by the stake was irrelevant. Defendant waived this argument by failing to object. (*People* v. *Berryman*, *supra*, 6 Cal.4th at p. 1072.) It is also meritless.

The prosecutor stated: "[A]ssume for argument that you possess a lingering doubt, whether or not the stake is pre- or post-death, do you think that mitigates the crime in any way? Do you think that all of a sudden you say gee, I think the defendant should receive the gift of life because that stake was two minutes before or two minutes after death? Is that what you really feel? Is that what you think the law is designed for? Isn't it everything that has occurred here?"

Defendant asserts that the prosecutor misstated the law and committed misconduct because the time "of the insertion of the stake had nothing to do with mitigation. It had everything to do with whether the prosecution had proven the special circumstance of torture beyond a reasonable doubt. If the stake was inserted after death, there was no capital crime, and the jury did not even have discretion to impose the death penalty."

Defendant's argument fails to grasp the fundamental distinction between the guilt and penalty phase. ▓▓▓ While the penalty jury may consider any lingering doubt, it "has no cause to deliberate further on whether any of them harbor reasonable doubt as to guilt or truth of the special circumstances." (*People* v. *Cain*, *supra*, 10 Cal.4th at p. 66.) ▓▓▓ The prosecutor properly argued that even if the jurors had a lingering doubt whether Lingle was alive when impaled by the stake, this factor in mitigation, when considered with all of the other penalty evidence, did not ineluctably lead to the conclusion that defendant warranted a penalty of life imprisonment without the possibility of parole rather than death.

Defendant further contends that the prosecutor's argument was improper because "it placed the burden of proof with respect to the entire penalty phase on the defense, by characterizing life as a 'gift' which defendant might 'receive' if he could prove that the stake was inserted into the body after death," and that it was misconduct to "shift the burden of proof onto the defense." Once again, defendant fails to grasp the fundamental differences between the guilt and penalty phases of a capital trial. ▓▓▓ In fact, aside from unadjudicated criminal activity, which the prosecution must prove beyond a reasonable doubt, neither party bears the burden of proof at the penalty phase. (*People* v. *Hayes* (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376].)

Finally, defendant claims that this statement improperly invited the jury to "make their own judgment about the public policy considerations underlying the death penalty, and rewrite the law in accordance with their personal judgment. . . . [and] act on their personal feelings, rather than the law." We perceive no such implication in the prosecutor's remarks, and believe there is no reasonable likelihood that the jury construed them as such.

### E. Constitutionality of California's Capital Sentencing Statute

Defendant contends "California's capital sentencing statute, Penal Code section 190.2," is facially unconstitutional because it fails to adequately narrow the class of murders eligible for the death penalty. Because this appeal concerns only the penalty retrial, and not the validity of the special circumstance finding, which was upheld in *Davenport I*, this issue is not properly before us. In any event, we have consistently rejected similar claims, and defendant asserts no compelling reason to revisit our conclusion. (See, e.g., *People* v. *Crittenden*, *supra*, 9 Cal.4th at pp. 154-156; *People* v. *Bacigalupo* (1993) 6 Cal.4th 457, 467 [24 Cal.Rptr.2d 808, 862 P.2d 808].)

Defendant further contends that even if "the special circumstance of torture could, theoretically, distinguish death-eligible murders from other murders," section 190.2 is unconstitutional as applied in this case. Defendant first contends that the absence of a requirement of the victim's subjective pain makes the torture-murder special circumstance unconstitutional. Once again, the issue of the validity of the special circumstance finding is not before us. Moreover, we thoroughly discussed and rejected defendant's similar claim in *Davenport I*, and he states no compelling reason to revisit that conclusion. (*Davenport I*, *supra*, 41 Cal.3d at pp. 263-271.)

Defendant further contends that "[c]ompounding the prejudice arising from the unreliable torture special circumstance finding, the prosecutor's theory of torture at the penalty retrial—relying on different evidence and far broader criteria—deprived Davenport of a reliable sentencing procedure when the new torture theory was pressed as aggravation." The prosecutor argued that if the jury had a lingering doubt as to whether Lingle was impaled by the stake ante mortem, it could consider other evidence of ante mortem torture, such as knife wounds, biting, and bruising. Defendant contends these events cannot constitutionally be used to support a finding of torture, because there was no evidence they caused Lingle "unusual pain." As we have already observed, however, there is no requirement that the victim subjectively experience pain. (*Davenport I*, *supra*, 41 Cal.3d at pp. 263-271.)

### F. Instructional Claims

#### 1. Definition of Torture

Defendant contends that the trial court erroneously instructed the jury concerning the definition of torture. Specifically, he argues that the instruction, which states that awareness of pain is not an element of torture, is erroneous. He further argues that the instruction fails to sufficiently narrow the concept of torture murder, so as to meaningfully distinguish torture murder from non-death-eligible murders. We thoroughly discussed and rejected defendant's similar claims in *Davenport I*, and he states no compelling reason to revisit these conclusions. (*Davenport I, supra*, 41 Cal.3d at pp. 263-271.)

#### 2. Lingering Doubt and Circumstantial Evidence

Defendant contends that the trial court erred in rejecting certain proffered instructions in violation of his right to a lingering doubt instruction and his rights to due process, equal protection, a fair trial, and a reliable and nonarbitrary penalty determination under the Sixth, Eighth, and Fourteenth Amendments. These claims are meritless.

Defendant first contends the trial court erred in rejecting his proffered lingering doubt instruction that "explicitly informed the jurors that they could consider lingering doubt as to 'whether John Davenport was the person who murdered the decedent,' in reaching a verdict."[7] We have held, however, that defendant "has no federal or state constitutional right to have the penalty phase jury instructed to consider any residual doubt about defendant's guilt." (*People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1187 [36 Cal.Rptr.2d 235, 885 P.2d 1].)

In any event, defendant abandoned this theory. During discussion of the jury instructions, the trial judge said, "Can I inquire, are you going to argue from the defense standpoint that there's a lingering doubt about his guilt of

---

[7]The jury was instructed: "In this case the defendant may properly call upon you to consider any lingering doubt as to whether the murder for which Mr. Davenport has been convicted involved the infliction of torture. Even though a prior jury has found the special circumstance to be true beyond a reasonable doubt, namely; that the murder was intentional and involved the infliction of torture, as torture will be defined for you in these instructions, a juror called upon to decide what penalty should be imposed upon the defendant may demand a greater degree of certainty for the imposition of the death penalty. A lingering doubt is a state of mind that exists somewhere between beyond a reasonable doubt and absolute certainty. Jurors who have a lingering doubt as to whether this murder involved the infliction of torture may properly consider such doubt as a mitigating factor in deciding upon the appropriate penalty for the defendant."

the murder or just the special circumstance of torture?" Defense counsel replied: "No, I—My withdrawal of those portions of the instructions regarding the perpetrator means that I'm not going to argue who the perpetrator was. . . . At this point . . . we're basically going to tell the jury that we accept the first jury's verdict on who did it." The court said, "So you're not going to argue that the murder wasn't intentional, either, then?" "No." "So it's just the element of torture which is going to be the subject of the lingering doubt argument." Defense counsel said, "Correct."

Defendant also asserts that the trial court erroneously rejected a modification of CALJIC No. 2.01, which "linked the cautionary instruction concerning circumstantial evidence to Davenport's lingering doubt defense, by stating: 'John Davenport has argued that he was not the perpetrator of the crime and that the crime was not committed while engaged in torture. . . .' "[8] The trial court refused to give the instruction on the ground that the proposed instruction suggested that the jury should redecide whether or not the crime involved torture, not merely consider as a mitigating factor whether they had a lingering doubt. The trial court acted within its discretion in so concluding.

### 3. Burden of Proof

Defendant contends that the trial court's reading of a modified version of CALJIC No. 2.90 was erroneous because it failed to inform the jury of the

---

[8]The proffered modification of CALJIC No. 2.01 provided: "The People have presented evidence of the facts and circumstances of the crime of murder and torture for which John Davenport is on trial and have alleged such facts and circumstances constitute a factor in aggravation. John Davenport has argued that he was not the perpetrator of the crime and that the crime was not committed while engaged in torture as a reason for not finding the facts and circumstances of the crime as an aggravating factor.

"To find a factor in aggravation based upon the facts and circumstances of the crime, you may not base such a determination on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant perpetrated the crime, but (2) cannot be reconciled with any other rational conclusion.

"Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt.

"Also, if the circumstantial evidence is susceptible of two reasonable interpretations, one of which points to defendant's guilt, and the other to the defendant's innocence, it is your duty to adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to his guilt.

"If on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and reject the unreasonable."

"presumption of innocence and the prosecution's burden of proof." The instruction was proper.[9]

As we have recently explained, "A court has no duty under statutory or constitutional law to instruct sua sponte on the presumption of innocence and the prosecutorial burden at the penalty phase." (*People* v. *Rodrigues*, *supra*, 8 Cal.4th at pp. 1190-1191.) "It makes no difference that defendant in this case requested such instructions and was refused. When, as here, the jury is effectively instructed that evidence of unadjudicated offenses is subject to the reasonable doubt standard, no more is required." (*Id.* at p. 1191; *People* v. *Benson* (1990) 52 Cal.3d 754, 809-810 [276 Cal.Rptr. 827, 802 P.2d 330].)

### 4. *Penalty Factors*

In instructing the jury concerning factors to be considered in determining a penalty, the trial court rejected defendant's proffered modification of CALJIC No. 8.85, and instead used its own modification. The trial court utilized a standard version of CALJIC No. 8.85, with the last sentence deleted, and the following language inserted immediately after the section 190.3, factor (k) language: "You are further instructed that you may consider only those potential factors I have just read to you from the law which you find to be present and applicable in this particular case. The absence of any potential mitigating factor from the list may not be treated by you as an aggravating factor." Defendant contends that this language was constitutionally deficient in several respects warranting reversal. None of these claims have merit.

Defendant first contends that CALJIC No. 8.85 erroneously encouraged the double counting of aggravating factors, because it "encouraged the jury to consider [defendant's] prior assault on a woman, both as criminal activity under factor (b), and as a prior felony conviction under factor (c)." According to defendant, the trial court erred in failing to clarify the distinct applications of the two factors, and the double counting artificially inflated the statutory factors favoring a death penalty. "As a result, the jury instructions failed adequately to guide and narrow the jury's discretion to impose the death sentence, precluded a reliable penalty determination in violation of the Eighth Amendment, and thereby prejudiced [defendant's] chances for a

---

[9]The jury was instructed: "Reasonable doubt is defined as follows: It is not a mere possible doubt, because everything relating to human affairs and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty of the truth of the charge."

life verdict." We have repeatedly rejected this claim. (*People* v. *Fierro*, *supra*, 1 Cal.4th at p. 230.)

Defendant next asserts that the trial court's failure to specify which factors are aggravating and which are mitigating violated the Eighth Amendment proscription against arbitrary and capricious imposition of the death penalty. In particular, he argues that this failure rendered meaningless and incomprehensible the trial court's warning that "the absence of any potential mitigating factor from the list may not be treated by you as an aggravating factor," and provided the jury with no specific guidance as to how to evaluate the factors. In a related argument, defendant asserts that the trial court erred in rejecting defendant's proffered version of CALJIC No. 8.85, which identified specific mitigating factors that the defense contended were applicable.

We have repeatedly held that "trial courts are not required to identify particular sentencing factors as aggravating or mitigating and that the 1978 death penalty law is constitutional despite the absence of such a requirement." (*People* v. *Howard*, *supra*, 1 Cal.4th at p. 1196; *People* v. *Pinholster* (1992) 1 Cal.4th 865, 973 [4 Cal.Rptr.2d 765, 824 P.2d 571].) Indeed, the high court recently upheld section 190.3, stating, "A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." (*Tuilaepa* v. *California* (1994) __ U.S. __, __ [129 L.Ed.2d 750, 764, 114 S.Ct. 2630, 2638].)

Defendant next challenges the trial court's statement, "You are further instructed that you may consider only those potential factors I have just read to you from the law which you find to be present and applicable in this particular case. The absence of any potential mitigating factor from the list may not be treated by you as an aggravating factor." This statement followed the court's reading of instructions given in the language of section 190.3, factors (a) through (k).

Defendant contends that the statement, "You are further instructed that you may consider only those potential factors I have just read to you from the law which you find to be present and applicable in this particular case," negated the trial court's instruction given in the language of section 190.3, factor (k).[10] Defendant contends that this statement "may well have left the jurors with the impression that the preceding list of specific factors (a)

---

[10]The jury was instructed in the language of section 190.3, factor (k), as expanded in *People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813]: "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."

through (j) was an exclusive list of the factors they were permitted to consider." While we discourage such a modification of CALJIC No. 8.85, we conclude that because the factor (k) language preceded the objected-to sentence, there is no reasonable likelihood that the jury construed this instruction to mean that factor (k) was not included in the list of the potentially applicable factors. (*People* v. *Clair, supra,* 2 Cal.4th at p. 663, fn. 8; *People* v. *Kelly* (1992) 1 Cal.4th 495, 525-526, fn. 7 [3 Cal.Rptr.2d 677, 822 P.2d 385].) Nor, contrary to defendant's assertion, is there any reasonable likelihood that the court's statement, "The absence of any potential mitigating factor from the list may not be treated by you as an aggravating factor," would be understood to mean that the jurors were only permitted to consider factors (a) through (j), and not factor (k) evidence.

Defendant next contends that the trial court erred in failing to delete inapplicable mitigating factors. This argument has been repeatedly rejected by this court. (*People* v. *Turner, supra,* 8 Cal.4th at pp. 207-208; *People* v. *Clark* (1992) 3 Cal.4th 41, 169 [10 Cal.Rptr.2d 554, 833 P.2d 561].) Contrary to defendant's assertion, such failure did not reasonably leave jurors with the impression that the absence of evidence of mitigation could properly be considered in aggravation. Indeed, as noted above, the jurors were expressly instructed that they could not consider the absence of mitigating evidence as a factor in aggravation. We presume that the jury followed the court's instructions. (*People* v. *Delgado, supra,* 5 Cal.4th at p. 331; *People* v. *Mickey, supra,* 54 Cal.3d at p. 689, fn. 17.) Nor did the failure deprive defendant of his right to a fair trial and reliable penalty determination under the Eighth and Fourteenth Amendments.

 Defendant further asserts that the inclusion in the list of potential mitigating factors of the adjective "extreme" in the instruction given in the language of section 190.3, factor (d), acted as a barrier to mitigation and rendered the factor vague in violation of the Eighth Amendment. However, an instruction in the language of section 190.3, factor (d), which allows the jury to consider whether the crime was committed while defendant suffered "extreme mental or emotional disturbance," does not unconstitutionally preclude the jury from considering mental or emotional disturbances that are not "extreme." Rather, the "catchall" provisions in section 190.3, factor (k), "referring to 'Any other circumstance which extenuates the gravity of the crime,' allow[] consideration of nonextreme mental or emotional conditions." (*People* v. *Clark, supra,* 3 Cal.4th at p. 163; *People* v. *Morales* (1989) 48 Cal.3d 527, 567-568 [257 Cal.Rptr. 64, 770 P.2d 244].)

### 5. *Concluding Instructions*

 Defendant contends that the trial court improperly instructed the jury in its concluding instruction because it did not adequately apprise the

jury that unless they found that the factors in aggravation outweighed the factors in mitigation, they could not impose a sentence of death. Not so. The trial court instructed the jury: "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." This is sufficient. (*People* v. *Wader* (1993) 5 Cal.4th 610, 662-663 [20 Cal.Rptr.2d 788, 854 P.2d 80].)

Defendant also argues that the trial court failed to inform the jury that if it found the factors in mitigation outweighed the factors in aggravation, it was required to impose a sentence of life imprisonment without the possibility of parole. Not so. "The instruction clearly stated that the death penalty could be imposed only if the jury found that the aggravating circumstances outweighed mitigating. There was no need to additionally advise the jury of the converse (i.e., that if mitigating circumstances outweighed aggravating, then life [imprisonment] without [the possibility of] parole was the appropriate penalty)." (*People* v. *Duncan* (1991) 53 Cal.3d 955, 978 [281 Cal.Rptr. 273, 810 P.2d 131].) Thus, contrary to defendant's assertion, he was not arbitrarily deprived of a state created liberty interest in violation of the due process clause of the Fourteenth Amendment, or his right to a reliable penalty determination under the Eighth Amendment.

Finally, defendant asserts that "the 'so substantial' standard for comparing aggravating and mitigating factors was both impermissibly vague and conducive to arbitrary and capricious decision making in violation of the Eighth Amendment." It was not. (See *Tuilaepa* v. *California, supra,* __ U.S. at p. __ [129 L.Ed.2d at p. 764, 114 S.Ct. at pp. 2638-2639]; *People* v. *Wader, supra,* 5 Cal.4th at p. 662.)

### 6. *Defendant's Testimony*

Defendant contends that the trial court had a sua sponte duty to instruct the jury to draw no adverse inference from his failure to testify. This claim is meritless.

As a preliminary matter, defendant did testify. To the extent he asserts that the trial court had a sua sponte duty to instruct the jury to draw no adverse inference from his failure to testify more fully, we reject this claim. Defendant concedes that we have held a trial court has no such sua sponte duty, but argues that the circumstances of this case compel a different result; he cites no persuasive reason to support his assertion that the circumstances of this case require a departure from the general rule. (*People* v. *Melton* (1988) 44 Cal.3d 713, 758 [244 Cal.Rptr. 867, 750 P.2d 741].)

### G. *Failure to Require Written Findings and Refusal to Use Defense Verdict Forms*

 Defendant contends that the trial court erred both in failing to require written findings by the jury concerning aggravation, and in rejecting his proposed verdict forms, and that these errors deprived him of his right to due process, and his Eighth and Fourteenth Amendment right to meaningful appellate review. He further contends the failure to require written findings rendered his death sentence arbitrary and unreliable.

As defendant acknowledges, we have repeatedly held that "written findings disclosing the reasons for the jury's penalty determination are not required." (*People* v. *Fauber* (1992) 2 Cal.4th 792, 859 [9 Cal.Rptr.2d 24, 831 P.2d 249]; *People* v. *Turner, supra,* 8 Cal.4th at p. 209 [failure to require written findings by jury does not deprive defendant of his due process and Eighth Amendment rights to meaningful appellate review].) Nor does the lack of such a requirement render defendant's death sentence arbitrary or unreliable. Defendant asserts no persuasive reason to revisit these conclusions.

Nor did the trial court err in rejecting defendant's proposed verdict forms.[11] During discussion, defense counsel conceded that not all of the forms were necessary, and appeared to agree to the language that appeared in the forms given the jury.[12] In any event, the trial court properly rejected the other forms as unnecessary and potentially confusing.

---

[11]The proposed verdict forms provided:

"We, the jury in the above-entitled cause, find that the mitigating circumstances outweigh the aggravating circumstances. Therefore, the punishment shall be life imprisonment without the possibility of parole.

"We, the jury in the above-entitled cause, find that the aggravating and mitigating circumstances are equal. Therefore, the punishment shall be life imprisonment without the possibility of parole.

"We, the jury in the above-entitled cause, find that the aggravating circumstances outweigh the mitigating circumstances but not substantially. Therefore, the punishment shall be life imprisonment without the possibility of parole.

"We, the jury in the above-entitled cause, find the aggravating circumstances substantially outweigh the mitigating circumstances and that the punishment shall be death.

"We, the jury in the above-entitled cause, find the aggravating circumstances substantially outweigh the mitigating circumstances but that the punishment shall be life imprisonment without the possibility of parole.

"We, the jury in the above-entitled cause, find we are unable to determine whether the aggravating circumstances substantially outweigh the mitigating circumstances. However, we agree the punishment shall be imprisonment without the possibility of parole."

[12]The jury received two verdict forms which read: "We the Jury in the above-entitled action find the aggravating circumstances substantially outweigh the mitigating circumstances and the appropriate penalty to be imposed upon the defendant JOHN DAVENPORT is death" and

### H. *Automatic Motion for Modification*

Defendant contends the trial court committed various errors in ruling on defendant's section 190.4, subdivision (e), automatic motion for sentence modification. None of these claims have merit.

#### 1. *Trial Judge's Performance of Duty*

██ Defendant contends that the trial court misunderstood its duty to independently review the evidence. Not so.

██ Under section 190.4, subdivision (e), the "court must independently reweigh the evidence of aggravating and mitigating circumstances and then determine whether, in the court's independent judgment, the weight of the evidence supports the jury verdict. It must set forth its reasons with sufficient particularity to allow effective appellate review." (*People* v. *Edwards, supra*, 54 Cal.3d at p. 846.) The record reveals the trial court understood and fully executed its responsibilities. (*Ibid.*) ██ In denying the motion, the court considered such mitigating factors as defendant's "value to his family," "remorse" for the Tewes assault, and "artistic ability," but found such evidence was "clearly outweighe[d]" by the "horrible" manner in which Lingle was killed and by defendant's other violent crimes.

Defendant contends, however, that the trial court erred in giving weight to the guilt and penalty phase jury verdicts. The trial judge stated, "And if I had any doubt about the defendant's guilt, about the crime I would say so. But I don't. And certainly the two juries have not either. They have found beyond a reasonable doubt that he did commit the crime and that the special circumstance of torture is true." Nothing in this passing statement indicates that the trial judge "abdicat[ed]" his duty to weigh the evidence independently, or that he relied on any jury finding. Rather, his awareness of this duty is replete throughout the record of the hearing. (See *People* v. *Sims* (1993) 5 Cal.4th 405, 467 [20 Cal.Rptr.2d 537, 853 P.2d 992].) Nor do we agree with defendant that the trial court's misstatement that both the guilt and penalty juries had found that defendant had committed the crime beyond a reasonable doubt indicates that the trial judge "relied on jury findings which did not even exist." No such reliance is apparent.

Defendant also contends that the trial court improperly considered a proposed commitment, or evidence not presented to the jury, in ruling on the motion to modify. Several days prior to the hearing on the motion to modify,

---

"We the Jury in the above-entitled action determine that the penalty to be imposed upon the defendant, JOHN DAVENPORT, is life without possibility of parole."

the court and counsel discussed the wording of a commitment proposed by the prosecution. After this discussion, the trial court inquired of defense counsel, "Anything in the proposed commitment that you see as inaccurate except for the matters obviously that haven't been heard yet. Because to a certain extent it anticipates the result of this hearing." Defense counsel ultimately said, "No, your honor." The court then said, "All right. We will just defer that for the time being then, . . . and see what actually occurs on" the date of the hearing.

At the hearing on the automatic motion to modify, the court made no reference to the proposed commitment in stating its reasons for denying the motion. Accordingly, the record reveals no basis for concluding the court improperly relied on matters not presented to the jury in ruling on the motion.

### 2. *Sufficiency of the Evidence*

Defendant contends that the motion for modification should have been granted because evidence adduced at the penalty phase retrial was insufficient to sustain the special circumstance of torture-murder. As we have already discussed, no such finding was made at the penalty phase.

### 3. *Proportionality of Judgment to Crime*

Defendant contends that the trial court should have granted defendant's automatic motion for modification on the ground that the judgment of death was disproportionate to his crime. In particular, defendant contends that there was no evidence of torture, and that the trial court was required to consider defendant's youth.

As discussed earlier, the validity of the torture-murder special circumstance was not an issue at the penalty retrial. Moreover, defendant was not particularly youthful; he was 25 years old at the time of the offense, and had been incarcerated for over 4 years for a remarkably similar crime. In any event, defendant's age at the time he committed his crimes does not automatically render his death sentence disproportionate; rather, defendant's repeated commission of such violent acts by the time he was 25 equally indicates that he was a seasoned criminal, not a naive youth. The trial court did not err in denying defendant's automatic motion for modification on this ground.

Defendant requests that we conduct our own proportionality review of his sentence. We interpret this as a claim that defendant's punishment is disproportionate to his individual culpability. (*People* v. *Webb* (1993) 6 Cal.4th 494, 536 [24 Cal.Rptr.2d 779, 862 P.2d 779].)

Defendant murdered a young woman by both brutally impaling a long, nail-embedded stake into her rectum, through various organs, and up to her armpit, and by severing her carotid artery. In the process of killing her he beat her, bit her breasts, and inflicted numerous stab wounds to her neck and hands. His criminal history is equally vicious. He smiled as he attacked Susan Tewes while she slept in her home, stabbing her 23 times in the eye, breast, lung, stomach, arm, hand, and throat, severing her jugular vein and leaving her near death. In less than a year after his release for that offense he murdered Gayle Lingle in the manner described above. After his arrest, defendant forcibly sodomized a fellow inmate and forced the inmate to orally copulate him. "Given the extraordinarily heinous nature of defendant's crimes, the death sentence is certainly not so disproportionate that it shocks the conscience [or] offends fundamental notions of human dignity." (*People* v. *Livaditis* (1992) 2 Cal.4th 759, 786 [9 Cal.Rptr.2d 72, 831 P.2d 297].)

## I. *Ineffective Assistance of Counsel*

Defendant contends that he was denied effective assistance of counsel on numerous occasions by both trial counsel. None of these claims have merit.

■■■ "Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel. [Citations.] The ultimate purpose of this right is to protect the defendant's fundamental right to a trial that is both fair in its conduct and reliable in its result. [Citations.] [¶] Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance." (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839], italics in original.) A defendant claiming ineffective assistance of counsel must first establish that "counsel's representation fell below an objective standard of reasonableness." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674, 693, 104 S.Ct. 2052].) He must then establish prejudice: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . . [¶] . . . . [¶] . . . . [¶] . . . . The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at pp. 693-694 [80 L.Ed.2d at pp. 697-698]; *People* v. *Clair*, *supra*, 2 Cal.4th at p. 653, fn. 2; *People* v. *Ledesma*, *supra*, 43 Cal.3d at pp. 215-218.)

"In analyzing the contentions, we must keep in mind the strong presumption that counsel's actions fell within the wide range of reasonable professional assistance. We also evaluate the conduct from counsel's perspective at

the time of the acts or omissions complained of." (*People* v. *Freeman, supra,* 8 Cal.4th at p. 513.)

### 1. *Failure to Challenge Jury Venire*

Defendant summarily contends that trial counsel's failure to file a motion to quash the jury venire, independent of the *Ramos* and *Cinco* cases, was ineffective assistance of counsel. However, we have no evidence in the record on which to determine whether such a motion, if made, would have been successful. (Cf. *People* v. *Mattson* (1990) 50 Cal.3d 826, 842-844 [268 Cal.Rptr. 802, 789 P.2d 983].) Hence, even assuming counsel's failure fell below an objective standard of reasonableness, defendant has failed to demonstrate a reasonable probability that but for counsel's unprofessional error, the result of the proceeding would have been different.

### 2. *Failure to Object*

Defendant contends that trial counsel were ineffective because they failed to object to 1) the admission of 43 photographs of the victim's body, the victim's clothing, including her peach colored blouse and torn underwear, and the presence of defendant's motorcycle in the courtroom throughout the trial; 2) the "vast majority of highly leading and improper questions" which the prosecutor posed to prospective jurors and witnesses, or much of the prosecutor's misconduct in his opening statement and closing argument; and 3) portions of the jury instructions.

As discussed above, there was no error in admitting the photographs or clothing, the prosecutor did not commit misconduct, and the jury instructions were proper. Accordingly, defendant fails to establish that his "counsel's representation fell below an objective standard of reasonableness." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 688 [80 L.Ed.2d at p. 693]; *People* v. *Ledesma, supra,* 43 Cal.3d at pp. 215-218.)

Defendant further contends that even when counsel did object, they did so in a "hang-dog fashion, which guaranteed that the objection would be overruled, and would actually have a negative impact on the jury." Defendant cites as an example the following statement by defense counsel: "I apologize to [the prosecutor], but just to preserve what we earlier discussed, obviously I object to the use of the existence or nonexistence of a mitigating factor and the way in which Mr. Robinson is arguing it to the jury. I know the court is going to overrule it but I think I need to preserve that."

This objection was made in the course of closing argument. Presumably, counsel apologized to the prosecutor because he was interrupting his closing

argument. Moreover, counsel's acknowledgment that the court had previously ruled adversely on similar objections effectively preserved the objection for his client while not antagonizing the court. Counsel's remarks appear courteous, not "despondent" as defendant suggests. In the alternative, counsel may have tactically wanted the jury to get the impression that he thought the judge was always, and hence by implication unfairly, ruling against him. Nothing inherent in either approach would automatically have a negative impact on the jury, or fall below an objective standard of reasonableness.

### 3. *Opening Statement*

Defendant contends that defense counsel was ineffective because he deferred his opening statement until the beginning of defendant's case. Not so. The decision whether to reserve opening statement is a matter of trial tactics and strategy that a reviewing court generally may not second-guess. (See *People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1059 [5 Cal.Rptr.2d 230, 824 P.2d 1277].) Reasonably competent counsel could have decided to wait to hear the prosecution's case before addressing the jury. (*Ibid.*)

Defendant further contends that defense counsel made the "spontaneous and unauthorized concession that John Davenport had killed Gayle Lingle." Counsel stated, "As far as the crime itself, it is not my intention to present evidence on that. We accept that verdict. He was found guilty of having killed Gayle Lingle and we accept the verdict."

Contrary to defendant's assertion, there was no unauthorized concession of guilt. Counsel simply stated that defendant accepted the verdict of the guilt phase jury. In any event, "Recognizing the importance of maintaining credibility before the jury, we have repeatedly rejected claims that counsel was ineffective in conceding various degrees of guilt." (*People* v. *Freeman*, *supra*, 8 Cal.4th at p. 498, and cases cited therein.)

Defendant next contends that defense counsel was ineffective because his opening statement did not mention Dr. Kornblum, or refer to particular evidence in mitigation of defendant's crime. Counsel stated that he was "going to start with evidence . . . that the stake was inserted after Gayle Lingle was already dead. But basically, for the most part, you are going to hear a very simple case. You are going to hear who this person is now." Reasonably competent counsel could have decided that focusing the jury's attention on the two central defense themes—lingering doubt as to the torture-murder special circumstance and the value of defendant's life— would best be accomplished by not delivering a recitation of the names and

anticipated testimony of each witness. Such a decision is a matter of trial tactics and strategy that a reviewing court generally may not second-guess. (*People* v. *Mitcham*, *supra*, 1 Cal.4th at p. 1059.)

### 4. Closing Argument

 Defendant contends that trial counsel was ineffective during closing argument because he stated that he was nervous and observed that his voice was quivering. Reasonably competent counsel could have decided to impress upon the jury the gravity of their duty in determining the appropriate penalty by demonstrating to them his own emotional concern, and that the depth and breadth of such concerns were such that it left him nervous and with a quivering voice.

Defendant next contends that defense counsel was ineffective when he stated, "If all that was required to impose the death penalty was that John Davenport committed a murder with torture, you wouldn't be here. The penalty would be automatic." Such a statement effectively reminded the jury that they had a choice in penalty, that selection of the appropriate penalty was a difficult and meaningful task, and that they should carefully consider and weigh the evidence. It does not demonstrate representation below an objective standard of reasonableness, or as defendant contends, "effectively undermin[e] any lingering doubt," or "obscur[e] the nature of the task with which the jury was faced."

Defendant next contends that defense counsel was ineffective when he stated: "If this is a crime of passion, how do you ever prevent a future crime by imposing a death penalty here? Take it one step further. [The prosecutor] suggested to you this morning that John Davenport didn't learn anything from the first offense. Well, if going to prison for the five years didn't prevent Gayle Lingle's death, what benefit will we get today if we impose death on John Davenport?

Defendant contends this argument "suggested strongly that the only way to prevent defendant from killing again would be to execute him." However inartfully worded, it appears that defense counsel was attempting to argue that the death penalty would have had no deterrent value in this case. Even assuming this statement fell below an objective standard of reasonableness, however, defendant has failed to demonstrate a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different.

Defendant next contends that defense counsel was ineffective when, after noting that "[t]he Legislature obviously believed there were some murder

tortures that are clearly not death penalty cases," he said, "How do you decide where this one fits? You've only seen one case. The one that's here. And this case probably scares you. And you wonder about the facts because [the prosecutor] was incredibly eloquent, understated, he laid them out very well, but you've only seen one case. And yet we're going to tell you that the appropriate result in this case is LWOP, life without possibility of parole. Well, you say to yourselves, that sounds absurd because I heard the facts of this case. Well, then think about this. We all know about the Hillside Strangler. We all read about it in the newspapers, Kenneth Bianchi and Angelo Buono. The jury in the Buono case came back after 13 homicides with life without possibility of parole in an hour. On the compendium as they saw Angelo Buono, they thought death was not the appropriate verdict. And if that doesn't tell you that your task doesn't end at the crime, there's nothing I can say to you. You still have an obligation to go through the process of deciding whether death is appropriate."

Contrary to defendant's assertion, defense counsel's reference to the prosecutor's eloquence did not "wrongfully suggest[] an acquiescence in the prosecutor's view of the law and of the case." Rather, defense counsel clearly indicated he thought life imprisonment without the possibility of parole was the appropriate penalty, and that despite the prosecutor's eloquence the jurors should recognize that juries in what defense counsel implied were more egregious cases had sentenced the defendants to life imprisonment without the possibility of parole. Contrary to defendant's further assertion, such an approach does not on the face of the transcript appear to be "floundering," or fall below an objective standard of reasonableness.

Defendant next contends that defense counsel was ineffective in limiting his argument regarding lingering doubt to the torture-murder special circumstance, and for stating that defendant "accepted" the verdict regarding guilt. We reject this claim for the reasons we rejected defendant's similar claim regarding defense counsel's opening statement. We further reject defendant's contention that defense counsel was ineffective because he failed to "logically and forcefully muster the evidence showing that there was no torture because Lingle was dead when the stake was inserted." Defense counsel referred to evidence that the stake had no blood on it as indicating Lingle was deceased when the stake entered her body. He further characterized the prosecutor as "backpedaling" during closing argument in light of this evidence, referring to the prosecutor's argument that the jury could consider any lingering doubt of torture based on not only the stake, but the stabbing and beating as well. Nothing in defense counsel's argument falls below an objective standard of reasonableness.

Defendant next summarily contends that certain comments by defense counsel "clearly discount[ed] the awesome seriousness of the proceedings." We have reviewed the challenged comments and conclude they fall far short demonstrating incompetence.

Defendant contends that defense counsel was ineffective when he stated: "I'm not going to ask you for sympathy or pity or any of those things because I agree with [the prosecutor]. Give him what he's earned. Give him what he's earned. And what I think he's earned is life without the possibility of parole. Okay. Let's talk about that right off the bat, okay? Give him what he's earned, life without the possibility of parole. One thing he has earned is to be severely punished. He has to be punished. We all have families, we all have—are interested in society being protected. I'm the same way. I'm interested in that. I've got a family. I don't want my family killed. I don't want my family hurt. People who do what John did have to be punished. Do they have to get the death penalty? No, they don't. But they have to be severely punished. And life without possibility of parole is a very, very severe punishment."

Contrary to defendant's assertion, counsel did not "explicitly align[] himself with the prosecution," "breach[] his fiduciary duty to his client," or "argu[e] against defendant's interests." Reasonably competent counsel could have concluded that an effective approach would be to acknowledge any punitive desire or fear on the part of the jury, and argue that life imprisonment without the possibility of parole satisfied both of those concerns. Nor, contrary to defendant's assertion, did counsel trivialize this argument by describing the limitations of prison life. No incompetence is demonstrated.

Defendant next contends that defense counsel was ineffective when he noted defendant had expressed remorse for the Tewes stabbing, and stated: "Those are the only actual words from John Davenport we have heard in this trial about his remorse. But I'll suggest to you something about his life that just cries out 'I'm sorry.' The way he lives his life, okay? . . . [The prosecutor] talked to you about why somebody can't say they did this—and he used the word—because maybe it's just such an atrocious crime that you just can't bring yourself to admit it. I don't know why he cannot say he did this. But [the prosecutor] may very well be right. I mean that makes sense to me. If you look at it in terms of the rest of John's life . . . he's got to feel so badly about this. This crime is probably so atrocious to this person that he cannot admit it and still feel that he has anything left of . . . what's important to him. And what is important to him? His family. He's probably terrified that he would lose his family."

Defendant does not elaborate on why he contends this statement demonstrates ineffective assistance of counsel. In fact, reasonably competent counsel could have decided in light of the prosecutor's argument that the crime

was not mitigated by direct evidence of remorse, that the jury might be persuaded to infer such remorse from the defendant's close relationship with and strong emotional support of his family.

Finally, defendant contends that defense counsel was ineffective when he stated at the end of his closing argument: "All I'm saying is don't worry about sympathy for him, don't worry about pity for him, give him what he's earned. I tell you, if you think he's earned the death penalty and in your heart of hearts you think he's earned it, vote for it. But think long and hard about the value that he can be, the value that he has demonstrated he can have to his family and hopefully to a lot more people. And I ask you to, based on that value, to vote for life without the possibility of parole. Like I say, long time I have been working to save his life, and now I'm asking you people to take over that task."

Contrary to defendant's assertion, this statement, when read in context, does not resemble "an impassioned plea for death." Rather, the opposite is true. Counsel's argument did not fall below an objective standard of reasonableness.

### 5. *Automatic Motion for Modification*

Defendant summarily contends that defense counsel was ineffective at the automatic motion for modification because he made no motion for a new trial and offered no written submission in support of the motion for modification, "notwithstanding the strong evidence that the torture special circumstance conviction was obtained by false evidence." Defendant does not explain how he was prejudiced by either omission, or what evidence he is relying on for the contention that the special circumstance was supported by false evidence. Hence, even assuming counsel's failure fell below an objective standard of reasonableness, defendant fails to demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

Defendant next contends that defense counsel was ineffective when he stated: "The jury has found that he committed this terrible crime. He has admitted that he did the other things. So we know he has committed three terrible crimes in his life. But he has tried hard. He has tried especially hard in these last eight years to make up for those things." Contrary to defendant's assertion, this statement did not "undercut" the effectiveness of defendant's written statement, which counsel read to the court, improperly concede guilt of all three crimes on defendant's behalf, or fall below an objective standard of reasonableness.

Finally, defendant contends that defense counsel was ineffective because the trial court stated: "Your argument of course at the time of trial was somewhat unusual in the sense that it did not pinpoint or focus on a number of mitigating factors as would ordinarily be the case. I think it falls under factor (k) . . . meaning factor (k) of the Penal Code, 190.3." The trial judge then delineated his recollection of the mitigating evidence presented at trial, as well as certain mitigating evidence counsel raised during his argument on the motion for modification that had not been before the jury, and inquired of counsel, "Is there anything that you feel that I have overlooked in the way of mitigating evidence or anything—any of the factors under Penal Code section 190.3 or anything else under factor (k) evidence which you feel I have not referred to?"

Contrary to defendant's assertion, these statements indicate diligence on the part of the trial court, not that the court found defense counsel's argument at the motion for modification "peculiar," or inadequate. Defendant has failed to demonstrate that counsel's presentation fell below an objective standard of reasonableness.

## CONCLUSION

For the reasons set forth above, the judgment is affirmed.

Lucas, C. J., Mosk, J., Kennard, J., Baxter, J., George, J., and Werdegar, J., concurred.

Appellant's petition for a rehearing was denied February 21, 1996, and the opinion was modified to read as printed above.